## COURT OF APPEALS, JUNE TERM, 1821.

### BROWNE, *et al.* Lessee, *vs.* KENNEDY.

APPEAL from *Baltimore* county court. Ejectment for a tract of land called *Cole's Harbour.* The defendant in the court below, (now the appellee,) took defence on warrant,

*The King of England has a right to grant land covered by navigable waters, subject to the right of the public to fish and navigate them.*

*The former Proprietors of Maryland acquired the same right of disposing of land covered by navigable waters within the Province, subject to the like restriction, under the charter by which the Province was granted to them by the King, as the King had prior to the charter. This right is now vested in the state.*

*Where the lines of a grant of a tract of land include a navigable river, the soil covered by the river will pass by the grant, though it be not described as land aqua cooperta, where the grantor has himself title to such soil.*

*By the common law proprietors of lands, bounded by unnavigable rivers, have not only the right of fishing, but a property in the soil covered by such rivers, ad filum medium aquæ. This is also the law of this state.*

*If one holds land bounding on a navigable river, and is also entitled to the land the river covers, and grants the former land, describing it as lying on the river, and bounding it on the river, the grantee will be entitled, as well to the soil the river covers, as to the land expressly granted.*

*The State is entitled to unnavigable rivers, and to the soil they occupy, and if the State grants land, lying on such a river, and calls for the river as the boundary of the grant, the grantee becomes Riparian proprietor, and entitled to the land the river covers, ad filum medium aquæ.*

and plots were made. At the trial of the cause it was agreed between the parties, that on the 1st of June 1700, a tract of land called *Todd's Range* was granted to *James Todd,* for 510 acres, being a resurvey on a tract called *Cole's Harbour,* granted to *Thomas Cole* the 17th of November 1668, for 550 acres. This grant, according to its true location, included within its lines all the land described and granted in and by the two deeds hereinafter mentioned, one from *Charles Carroll* to *William Lyon,* and the other also from said *Carroll* to *Alexander Lawson,* as those deeds are located on the plots in this cause; the lines of this tract run across the stream called *Jones's Falls,* and included the whole of that stream for a considerable distance above and below the place where it is touched by the lines of the two above mentioned deeds. Before the 18th of April 1757, the tract called *Todd's Range,* by sundry mesne conveyances and devises, became vested in *Charles Carroll,* esquire, of the city of *Annapolis,* and his heirs; and on the day last mentioned he, by deed of that date duly executed, acknowledged and recorded, conveyed a part of said tract lying on the north west side of *Jones's Falls* and bounding on it, to *William Lyon,* in fee simple; which part is described by metes and bounds, courses and distances, as follow, viz. "Beginning," &c. "and running thence N. 33° 30', W. 5 ps. unto *Jones's Falls,* then bounding down and with the said Falls the twelve following courses, viz. S. &c. containing 13 and an half acres of land, more or less. On the 20th of May 1757, said *Carroll,* by deed of that date duly executed, acknowledged and recorded, conveyed to *Alexander Lawson,* and his heirs, another part of said tract, also binding on *Jones's Falls* on the south east side, opposite to a part of the land sold as aforesaid to *William Lyon.* This part is also described by metes and bounds, courses and distances, as follow, viz. "Beginning," &c. "and running thence N. 59° E 22 ps. N. 2° E. 12 ps. unto *Jones's Falls,* then bounding upon and with the said *Falls* the seven following courses, viz. N." &c. containing seven and an half acres of land more or less; These two deeds are truly located by the defendant on the plots; the stream called *Jones's Falls,* in all that part of it which ran through *Todd's Range,* as it ran at the time of making the patent and deeds, is also truly located on the plots by the defendant. Before the year 1745 a bridge was

June 1821.

Browne
vs
Kennedy

erected across said stream, below the place where it is touched by any of the lines of either of said deeds, and was in that year, by act of assembly, declared to be a public highway, and has ever since been continued and kept up as such till this time. At the time of the grant of *Todd's Range*, and until the year 1786, the ordinary or common tides flowed up *Jones's Falls* to the place marked *C D* on the plots, but never flowed as high as the upper or northermost part of the tract called *Todd's Range*, which extended a considerable distance above the place marked *C D*, including the land on both sides. Until the year 1787, boats frequently and regularly ascended said stream to the place marked *C D*, but never higher up. At the time of making said patent and deeds, said stream, at the place marked *F*, near *Gay*-street bridge, on the plots, was 100 feet wide; at the place marked *C*, 82 feet wide; at the place marked 27, 74 feet wide; at the place marked *f*, 47 feet wide; at the place marked *G*, in the centre of the stream, 47 feet wide; and at the place marked *C D*, 45 feet wide—gradually diminishing in width throughout all this part of its course. All the estate and interest of *Alexander Lawson*, under the deed to him, became regularly vested in *Elizabeth Lawson*, the original lessor of the plaintiff in this cause, before the time of bringing this action; and on her death it vested in the present lessors of the plaintiff and their heirs. Before the bringing this action all the estate and interest of *William Lyon*, under and by virtue of the deed to him, was vested in *John Smith* and *Benjamin Williams*, and others, and their heirs, as tenants in common, and under them the defendant claims as tenant at will. Some time in the year 1786, some of the proprietors of the lands on both sides of *Jones's Falls*, for their own benefit, and with the consent of the other proprietors of lands there, including *Alexander Lawson*, and those claiming under *William Lyon*, who was then dead, diverted the then course of *Jones's Falls*, by cutting a new channel for its waters, as represented on the plots, and there marked as the "*canal of Jones's Falls*," and through that channel the waters have ever since continued to flow. After making of said canal, the old bed of the *Falls*, between the points where it is intersected by the canal, was gradually filled up by the washing of the adjacent lands, by the persons under whom the defendant claims, and by the im-

JUNE 1821. provements made in the neighbourhood, and at the institu-
tion of this suit had wholly disappeared, the place being
laid out and occupied as part of the several lots and streets
in that part of the city of *Baltimore*. On the 26th of Ja-
nuary 1795, *Charles Carroll*, of *Carrollton*, the heir at law
and general devisee of said *Charles Carroll*, of *Annapolis*,
duly executed to *John Smith*, *Benjamin Williams*, and
others, under whom the defendant claims as aforesaid, a
deed, which was regularly acknowledged and recorded, and
which is truly located on the plots; by which he conveyed
to said *Smith*, *Williams*, and others, in consideration of the
sum of £750 current money, "all that part of a tract of
land called *Cole's Harbour*, or *Todd's Range*, lying and
being in the county of *Baltimore*, (excepting such parts
thereof as have been heretofore sold and conveyed,) which
part is contained within the following metes, bounds, courses
and distances, viz. Beginning for the same at," &c. "and
running," &c. "to the middle or centre of the bed of *Jones's
Falls*, then running in the middle or centre of said *Falls*,
N." &c. &c. "on the east side of said *Falls*, then running
and bounding on the east side of said *Falls* the following
courses, S." &c. "and all the estate, right, title, interest,
property, claim and demand whatsoever, either in law or
equity, of him the said *Charles Carroll*, of *Carrollton*, of
and in the aforesaid part of a tract of land and premises
herein before mentioned to be bargained and sold," &c.
All that part of land which is included within the claim
and pretensions of the plaintiff, and in the defence of the
defendant, as both are located on the plots, is a part of the
old bed of *Jones's Falls* as it was before the stream was di-
verted in the manner above mentioned, and is now in the
sole and exclusive possession and occupation of the defen-
dant, and those under whom he claims, and who, before the
time of bringing this action, actually ousted said *Elizabeth
Lawson* therefrom. *Cole's Harbour* and *Todd's Range*
are one and the same tract of land. Upon these facts, the
court below, (*Bland* and *Hanson*, A. J.) (*a*), being divided
in opinion as to the plaintiff's right to recover, there was a
verdict and judgment against him, and he appealed to this

*Browne
vs
Kennedy*

---

(*a*) These Judges gave long and learned opinions, but as they
are published at length in Niles' Reg Vol. 18, p. 225, it is unne-
cessary to publish them here. Judge *Bland's* opinion was against
the plaintiff; Judge *Hanson's* for him.

court, where the cause was argued at this term before
CHASE, Ch. J. BUCHANAN, EARLE, JOHNSON and MAR-
TIN, J.*(a)*.

*Harper* and *Taney*, for the appellant. They referred to
*Harg. Law Tracts*, 6, 22, 32, 36, 37. 1 *Mod.* 105. *Car-
ter vs. Murcot*, 4 *Burr.* 2164. The *Mayor and Common-
alty of Oxford vs. Richardson*, 4 *T. R.* 439. 2 *Blk. Com.*
39, 40, 261, 262. *D. Dulany's Opinion* in 1 *Harr. &
M'Hen*, 564. 5 *Bac. Ab.* tit. *Prerogative*, (B.) 495. *Coop-
er's Just.* tit. 1, s. 22, 23; and *Stevens vs. Whistler*,
11 *East*, 51.

*Pinkney, Winder,* and *Williams,* (Assistant Attorney
General,) for the appellee. They cited 5 *Bac. Ab.* tit.
*Prerogative*, (B. 2,) 497. *Hale de Jure Mar.* 32 to 35.
2 *Bac. Ab.* tit. *Of the Court of Admiralty*, 177. 5 *Com.
Dig.* 102. The *King vs. Smith*, *Doug.* 444. *Shultz Ag.
Rights*, 106, 136, The *Charter of Maryland,* sections 4,
16. *Smith and Purviance vs. The State*, 2 *Harr. &
M'Hen.* 244. *Just. Inst.* lib. 2, tit. 1, s. 20, 22, 23. *Dig.*
lib. 41, tit. 1, s. 7, 8. 1 *Brown's Civil Law,* 237, 238.
2 *Blk. Com.* 261. *Bracton,* lib. 2, ch. 2. *Pothier on
Prop.* Nos. 158 to 164. The *Batture Case,* 27, 58, 272.
*Hale de Jur. Mar.* 5. *Carter vs. Murcot*, 4 *Burr.* 2164.
5 *Bac. Ab.* tit. *Piscary,* 319. *Co. Litt.* 4, 6; and 2 *Bac.
Ab.* tit. *Grant,* (J,) 396.

CHASE, Ch. J. I am of opinion, that the lessors of the
plaintiff have a right to recover the land in question to the
middle bed of *Jones's Falls;* that *Charles Carroll* having
title to the lands in question, and all rights, privileges and
advantages, derivable therefrom, did, by his two deeds to
*William Lyon* and *Alexander Lawson,* convey the same to
them, and thereby did divest himself of all right and in-
terest in the same.

*Charles Carroll,* prior to the said deeds, holding the said
lands on both sides of *Jones's Falls,* had the right, privi-
lege, and advantage of accretion by alluvion, or by the
gradual recession of the water from the banks or shores of
the *Falls.*

*Charles Carroll,* by his deed dated 18th of April 1757,
to *William Lyon,* transferred all his right and interest to

June 1821. him in the lands lying on the north side of *Jones's Falls*,
as described in the said deed; and by his deed to *Alexan-*

Browne
vs
Kennedy

*der Lawson*, dated the 20th May 1757, transferred all his
right and interest to the said *Lawson* in the lands lying on
the south east side of said *Falls*, opposite to part of the
land sold to *Lyon*.

The grantees under the said deeds acquired a right to
the accretion by alluvion, or the recession of the water
from the banks or shores of *Jones's Falls*, within the limits
of their respective deeds, *ad medium filum aquæ*, as in-
cident or appurtenant to those parts of the land binding on
*Jones's Falls*, according to the principles of the common
law, common right, and common-justice.

As the water receded from the land, or the land was in-
creased or added to by alluvion, the lines of the land
granted to *Lyon* and *Lawson*, binding on *Jones's Falls*,
would attach to and bind with the water until the accre-
tion got *ad medium filum aquæ*.

As to the right to accretion by the recession of the wa-
ter from the banks, or by alluvion, it makes no difference
whether the water is navigable or not, the owner of the
land adjoining or contiguous to the water will be entitled
to the benefit of accretion, as incident or appertaining to
his grant, because his lines binding on *Jones's Falls* being
the boundaries of his land, will run with and bind on the
water, and so include the land made by accretion.

It is stated as part of the case, that the stream of *Jones's
Falls* was diverted by cutting a channel with the consent of
the owners of the land on *Jones's Falls*, in the year 1786,
through which canal the waters have since flowed.

It is also stated, that until the year 1786 the common
tides flowed up *Jones's Falls* to *C D*, marked on the plot,
and that until 1786 boats frequently and regularly ascend-
ed *Jones's Falls* to *C D*, but never went up higher.

It is also stated, that after the making of said canal the
old bed of the stream, between the points where it was
intersected by the canal, was gradually filled up by the
washing of the adjacent lands, by the persons under whom
the defendant claims, and by the improvements made in
the neighbourhood, and that the bed of the river hath
wholly disappeared.

The question is now to be considered—Whether the les-
sors of the plaintiff, claiming under *Alexander Lawson*, are

entitled to the land to the middle bed of *Jones's Falls*,

from the lines of the land conveyed to *Alexander Lawson*
binding on the *Falls*, or what part thereof?

I lay it down as a position indisputable, that *Charles Carroll*, by his two deeds to *William Lyon* and *Alexander Lawson*, transferred to them all his right and interest in the lands in controversy, with all the privileges and benefits appertaining to the same, and consequently nothing passed by his last deed under which the defendant claims.

The diverting the water by the canal cut in 1786, with the consent and approbation of the owners of the land on *Jones's Falls*, could not diminish the interest which accrued to *Alexander Lawson* under his deed from *Charles Carroll*, nor could he be thereby deprived or divested of any right or privilege derived under it.

The gradual filling up of the *Falls* by the washings from the adjacent lands, would benefit *Lawson* by adding to his land binding on his side of the *Falls*.

The rights of *Lawson* could not be divested by the acts of those under whom the defendant claims, in filling up the *Falls*, such acts would operate beneficially to *Lawson*, and would not be allowed to interfere with his rights by alluvion.

The filling up by the washings from the improvements in the neighbourhood, would be for the benefit of those holding the lands to the *Falls*, and must have been gradual and imperceptible, which is the precise and proper definition of accretion by alluvion.

Although *Jones's Falls* was not navigable higher up than *C D*, after the year 1786, yet the stream remained, but was gradually filling up from the time the canal was cut, by the washings from the adjacent lands, the improvements made in the neighbourhood, and the acts of those under whom the defendant claims; all which causes operated for the benefit of all those who held lands on the *Falls* higher up than the canal, and not for the exclusive benefit of the defendant, and those under whom he claims, who had only a common right, with the other owners on *Jones's Falls*, to the accretion made from their respective shores.

It is not stated in the case what were the acts of the persons, under whom the defendant claims, which contributed to the filling up of the stream, nor the extent of those acts. The filling up of the stream must have been by the wash-

ings from the adjacent lands, and the improvements made in the neighbourhood, in which the acts of those under whom the defendant claims might be included.

If the court was warranted in presuming that the acts of those under whom the defendant claims were the depositing of earth and filth on the shore of the *Falls*, within the limits of the deed to *William Lyon*, still they could not be entitled to accretion beyond the middle bed of the stream.

From the dates of the deeds to *Lyon* and *Lawson*, *anno* 1757, to the year 1786, the time of cutting the canal, *Lyon* and *Lawson* were entitled to the benefit of accretion by alluvion, a space of 29 years. The canal having been cut with the consent and approbation of all the owners of the lands on *Jones's Falls*, that act could not, and was not intended, to operate more to the advantage of one proprietor than another, and no right previously acquired could be divested by it.

I am of opinion, whether the accretion was by alluvion, the recession of the water from the shores, or the depositing of earth and rubbish in *Jones's Falls*, by the respective owners, or others, since the canal was cut, the legal effect is the same, and the plaintiff is entitled to recover *ad medium filum aquæ*, or to the place where it has been ascertained on the plot to be. I do not think it is necessary to go into an inquiry into the rights of the King or the Proprietary. I have no doubt the King, by the charter to the Proprietary, granted all the rights he enjoyed within the limits of the charter, subject to such savings and exceptions as are contained therein, and that the Proprietary had a right to grant the land, covered by a navigable river, without interfering with or affecting the public or common right of user for the purposes of navigation and fishing, and that the grantee, the courses of whose grant bound on the river, could claim the land, and would hold it, as the water receded from the land so granted, or the land was added to by alluvion, or depositing earth and rubbish on the shore, or in the water between the shore and the middle bed of the river, by a stranger. I am also of opinion, that the State of *Maryland* is invested with all the rights within the boundaries of the charter as the King of *Great Britain* ever did or could enjoy.

BUCHANAN, J. The first question arising from the facts in this case is, Whether the property in the soil covered by the waters of public or navigable rivers, was vested in the Lord Proprietary by the charter of *Maryland?*

It is very certain that by the common law the right was in the King of *England;* and it seems equally clear to me, that he had the capacity to dispose of it *sub modo.* Whatever doubts are entertained on the subject, they probably have arisen from inattention to the distinction between the power of granting an exclusive privilege, in violation or restraint of a common piscarial right, or other common right, as that of navigation, and the power of granting the soil *aqua cooperta,* subject to the common user. The subject has, *de communi jure,* an interest in a navigable stream, such as a right of fishing and of navigating, which cannot be abridged or restrained by any charter or grant of the soil or fishery since *magna charta* at least.

But the property in the soil may be transferred by grant —*Hargrave's Law Tracts,* 17, 22, 36, 37—subject however, to the *jus publicum,* which cannot be prejudiced by the *jus privatum* acquired under the grant. This distinction runs through all the books, and wherever grants have been held not to pass the soil, it was not because the King had not the capacity or right to grant it, but because there were not apt words in the grant to effect the purpose, as in the case of the *Attorney General vs. Sir Edward Farmer,* in the Exchequer Chamber. 5 *Bac. Ab.* tit. *Prerogative,* 495. 2 *Mod.* 106. Sir *T. Raym.* 241. And it was there admitted, that the King might grant a part of his seas by express name—so a grant of *incrementá maritima,* will not pass lands that often happen to be relict by the sea, because that is not so properly *maritimum incrementum;* and besides, the soil itself under the water is actually the King's, and cannot pass from him by such an uncertain grant as *maritima incrementa,* but it must pass a present interest—*Harg. Law Tracts,* 18. But in the same page it is said, that if the King will grant land adjacent to the sea, together with a thousand acres of land covered by the waters of the sea, as usual of the same land, &c. adjacent, such a grant as may be penned will pass the soil itself, and if there shall be a recess of the sea leaving such a quantity of land, it will belong to the grantee. And it will be found, on examination, that the right of the King to grant

the soil *sub modo*, has never been denied; the question, whether the soil passed or not, being always made to depend on the construction of the grant, arising from the particular expression used.

The 4th section of the charter to Lord *Baltimore*, has these words—"Also we do grant, and likewise confirm, unto the said Baron of *Baltimore*, his heirs and assigns, all islands and islets within the limits aforesaid, and all and singular the islands and islets from the eastern shore of the aforesaid region, towards the east, which have been, or shall be, found in the sea, situate within ten marine leagues from the said shore; with all and singular the ports, harbours, bays, rivers and straights, belonging to the region or islands aforesaid, and all and singular the soil, plains, woods, mountains, marshes, lakes, rivers, bays and straights, situate or being within the metes, bounds, and limits aforesaid, with the fishings of every kind of fish," &c. with a saving in the 16th section to the King, and his successors, and to all the subjects of the Kingdoms of *England* and *Ireland*, of the liberty of fishing for sea fish, &c. The language of the 4th section of this instrument is too plain and explicit to admit of any doubt, and is strengthened, rather than weakened, by the saving in the 16th section, and clearly passed the property in the soil, covered by any of the waters within the limits of the charter, to the Lord Proprietary; who, thus become owner of the soil, subject to the common right of fishing and of navigation, had full power and authority to dispose of it. By his grant of the 1st of June 1700, of the tract of land called *Todd's Range*, which appears to have been a resurvey on *Cole's Harbour*, all the land covered by the water of *Jones's Falls*, which is included within the lines of the grant, passed to *James Todd*, the grantee, subject to the same public easements; there being no doubt, that where the lines of a grant include a stream, the soil covered with water makes a part of the grant, and passes with the rest, without being described as land *aqua cooperta;* and was held by *Charles Carroll*, charged with the same *jus publicum*. The question remaining to be examined is, whether *William Lyon*, and *Alexander Lawson*, under their several deeds from *Charles Carroll*, took *ad filum medium aquæ*, or were respectively restricted to the margin of the river, leaving the title to the bed of the stream in *Charles Car-*

June 1821.

Browne
vs
Kennedy

*roll ?*  For, with great deference for the opinion of the chief judge, it seems to me, that unless the right of property in the soil, to the middle of the stream, vested in them under and in virtue of their respective deeds, there is no other ground on which they, or those claiming under them, can be entitled to it; for if it did not pass from *Charles Carroll*, by his deed, the right of property still remained in him.    And if an island had arisen in the river, it would have belonged to him; or if the bed of the river had been left bare, by a sudden recess of the water, as the *jus publicum* would thereby necessarily have been destroyed, the relicted land would have remained his, and would not have appertained to those who held the adjoining lands on either side.    And upon the same principle, *eo instanti* that the stream was diverted from its original course in the year 1786, by digging the canal, the soil of the uncovered bed, the right of property of which he had never parted from, would have been thrown upon him, unaffected by a public right, the usufruct having ceased, and no subsequent filling up, or other change in the surface of the *locus in quo*, by natural and artificial means, or either, could have the effect to deprive him of his right of property in the soil.    I think, therefore, that the law in relation to the right of alluvion is not applicable to the facts in this case, and that *Lyon* and *Lawson* were either entitled to the relicted soil, when the water was first diverted, or not at all.

By the common law, the proprietors of estates bounded by rivers not navigable, or, as they are often called, private rivers, not only have the right of fishing, but the property in the soil itself, *ad filum medium aquæ; Harg. Law Tracts*, 5.   5 *Bac. Ab.* tit. *Prerogative*, 494; because, as it is said, they are presumed to have been distributed out, and appropriated as other lands.   And sometimes by prescription, it is the same as to public rivers, as in the case of the river *Severn*.   This is a rule of property in *England*, and I hold it to be equally the law of this state.

It seems to be admitted, that as the lands conveyed by *Carroll* to *William Lyon* and *Alexander Lawson*, are described in the deeds as bounding upon *Jones's Falls*, if that had been a private river, they would have been entitled to hold to the middle of the stream; and, if I am right in supposing that the property in the soil was *Carroll's*, subject

June 1821.
Browne
vs
Kennedy

only to the common user, I cannot perceive why *Jones's Falls*, when the *bed* had become private property, should not be subject, *sub modo*, to the same rules (as to the *right to the soil*,) that prevail in relation to private rivers, which are private property. In many respects the same rules do prevail. If one has an estate, through which a private river runs, and an island should arise in the river, it will belong to him; so, if he has the property in the soil of a public river, and an island springs up, it will equally belong to him. Again, if in the case of a private river, the bed is left bare by a sudden recess of the water, the relicted land remains the property of the former owner; and so, if one had the property in the soil of a public river, and the bed is left bare by a sudden recess of the water, the relicted land will remain his; because in each case the property in the soil is in him. And for the same reason all islands, relicted land, and other increase arising in navigable rivers, belong, in *England*, to the King, here to the State, where the property in the soil has not been appropriated; but where it has become private property, either by grant or prescription, the same rules do or should apply to it that govern other private property of the same nature. It is subject to the same law of descents, and liable to be transferred by the same mode and form of conveyance, and is subject to none of the rules applicable to lands not granted or distributed *out*. If therefore, where a man having an estate through which a private river runs, conveys away his land lying on one side of the stream, and describes it as bounding on the river, the purchaser will, by operation of law, hold to the middle, it would seem, by parity of reason, that if the same man, having an estate through which a public river runs, the soil of the bed of which makes a part of his estate, as in the case of a private river, conveys away the land lying on one side, and makes the river the boundary, the purchaser would, by the same operation of law, be entitled to hold, in respect of the right of soil, to the middle of the stream. For why in one case more than the other, should the purchaser be restricted to the margin of the stream, the river acting equally as a boundary in both cases, &c. and the public easement being in no manner disturbed. In both cases the soil is the private property of the seller, and the same reason applies as well to one as the other, whether he acquir-

ed his title by grant, or holds it under the fiction that it was originally distributed out to him. And if in the latter case, the purchaser would not be entitled to hold in respect of the soil to the middle of the river, neither should he be in the former. But the cases put may be more nearly assimilated, by supposing that in the case of the private river, the exclusive right of fishing had been before granted to another, so that the seller would have nothing but the property in the soil in either, subject to an exclusive right of fishing in the one case, in another, and to a common of fishery in the other case. On what principle it is, that the riparian proprietors are held to have the property in the soil, to the middle of a private river, is not material. Whether the law assigns it as a specific limitation to their respective ownerships, because that streams, being in their nature unstable, the limits of estates depending upon them would, if confined to the margins, be unsettled; or that the river acts as a boundary between them, and that, therefore, they are carried to the ideal line that is supposed equally to divide the stream. But admit the rule, and it applies with equal reason and policy to public or navigable rivers, the beds of which have been granted out and become private property. For it cannot be imagined, that the seller when he uses the same words of description, intends in the one case more than the other, to restrict the purchaser to the margin of the stream. All the lands in this state have not been distributed or granted out to the citizens as they are supposed to have been in *England;* but unnavigable rivers, and lands not patented, are as much the property of the state, as public rivers in *England* are the property of the King. And if the state grants a tract of land, bounding on an unnavigable river, I hold the rule before alluded to, to apply, and that the grantee will be entitled to the soil to the middle of the stream. And applying the same rule to this case, I think that *Alexander Lawson,* under his deed from *Charles Carroll,* was entitled to hold to the middle of *Jones's Falls,* and agree with the chief judge that the appellant is entitled to recover the land which forms the subject of this suit.

Johnson and Martin, J. concurred in this opinion.

Earle, J. By the agreement of the parties, the statement of facts in this case has undergone a considerable al-

JUNE 1821.

Browne
vs
Kennedy

teration since it was argued: As it is now understood by me, there is no question of alluvion to be decided by this court, there having been a complete diversion of the waters of the *Falls* by the cutting of the canal in the year 1786, which laid the bed of the river as effectually bare as if its waters had been suddenly withdrawn by natural means. The point then is, to whom did the soil of the river belong at the time of the desertion of its waters; or which is the same thing, did the soil of the river pass by the deed of 1787 from *Carroll* to *Lyon*, and from *Carroll* to *Lawson*, which it is admitted did not in express terms comprise it within their lines? The *Falls* is conceded to have been a navigable river, and the position is not now to be disputed, that it was granted by the Lord Proprietary to *Todd*, under whom *Carroll* claimed as a part of *Todd's Range*, subject nevertheless to a right common to all persons to navigate and fish its waters.

It may be considered a settled rule of the common law, that private rivers, wherein the tide does not ebb and flow, and which are not navigable, belong to the owners of the adjoining lands on each side, who, as a consequence of the ownership of the soil, have the exclusive right of fishing therein, *ad filum medium aquæ*. This principle proceeds on the ground of a legal fiction, that all the property of the Kingdom was originally in the King as universal occupant, and that the soil of such rivers has been distributed out by him among his subjects. *5 Bac. Ab.* 495. It is a principle based on the soundest policy. Its purpose is to assign a particular proprietor to every thing capable of ownership, leaving as little as may be in common, to be the source of contention and strife. *2 Blk. Com.* 261. It is the common law effect of a grant of land thus situated; that is to say, land adjoining to private rivers, from one individual to another, to carry with it this right of soil and fishing; and to its complete transfer, a particular description is not necessary, nor even the mention of the right. Like other common law rights, it is, however, liable to be controled by special custom or grant. *Harg. Law Tracts, s. 5.* The soil of the bed of a private river may belong to one person, and the adjoining lands to another; and it is not perceived why they may not exist as separate rights at the same time in the same person; why the owner by special custom of the soil of a private river, may not become the owner of the

adjacent lands, without his special right becoming extinct,
and merging in the riparian right? The utmost diligence
of research has not discovered to me a single case in which
such separate rights have become thus united.

How far this common law doctrine in relation to private
rivers, is applicable to unnavigable waters, or fresh water
streams, in this state, has never been decided by our courts
of justice; yet I am not at all disposed at present to ques-
tion its applicability. Certain it is, that neither in *Great
Britain* nor here, can the principle be applied to arms of
the sea, or navigable rivers, in which the tide flows and re-
flows, and in which a right exists of fishing and navigating
common to all, so long as the King, or the public, have a
property in those rivers. *De communi jure*, the right of
navigable rivers, and arms of the sea, belongs to the King,
and he hath the property in the soil thereof, having never
distributed them out to his subjects, and his subjects can
never have any claim thereon except by alluvion; and as to
waters of this description in this state, the Lord Proprieta-
ry is to be considered, under the charter of *Maryland*, to have
been in the place of the King. This right of property in navi-
gable rivers, and arms of the sea, exists in the King, and ex-
isted here in the Lord Proprietary, without any reference
to the ownership of the adjoining lands; and no person can
doubt, that a grant by the one, or the other, of lands bor-
dering on navigable rivers, would not have had the effect to
carry with it any part of the soil covered by its waters—
And the reason is plain; because the common law princi-
ple, of which I have been speaking, has no application to
rivers that are navigable, and such as of common right, as
easements, belong to all; and because such operation of the
grant would have been in derogation of two known rules
of the common law, which are, that the soil of a public or
navigable river can never be presumed to be in a private
person; and the King can never grant a part of his seas
without positive and appropriate expressions to pass the
right.

If the Lord Proprietary had then granted to *Todd* the
tract called *Todd's Range*, describing a part of it to lay on
the north side of the *Falls*, and part of it on the south side
of that water, and binding the same on the margin on each
side, the bed of the river would not have been conveyed to
him by the grant, it not being a private river, and the rule

of the common law, so often mentioned, not applying to the subject. Had this been the manner of the grant, the soil of the river would have been retained by the Proprietary, and in 1786, when it was forsaken by its waters, the *Falls* would have been the property of the public. But the patent of *Todd's Range* was not so worded, and was made to include within its lines the bed of the river, as well as the land on its banks, and the grantee took the same in virtue of the concessions of the grant, and so holding the right, transmitted it to *Carroll*. What then was *Carroll's* rights in 1757, when he conveyed to *Lyon* and *Lawson?* For such as were then attached to the land conveyed, he transferred to them, and he could transfer none other. He occupied exactly the place of the Lord Proprietary, before he granted to *Todd;* and if the Proprietary would have retained the bed of the river by limiting the lines of the grant to run with its margin on each side, which I have before endeavoured to demonstrate, the deeds in question have precisely the same operation, and consequently the soil of the river was not passed away by *Carroll* in the year 1757. His right to the bed of this navigable river was derived to him by grant, and not being a right derived to him from his ownership of the adjoining lands, which is admitted, where it applies, to be a substantial rule of property, it could not have been the common law effect of his deeds, to transfer the soil of the river covered with water, by conveying away the adjoining lands on each side of it. Having no riparian right to the bed of the river, he could not impliedly convey such to *Lyon* and *Lawson,* and in consequence the soil of the river appears to me to have been retained by him, and to have been as much his, as, if subsequently to the year 1757, he had obtained his first grant of it from the Proprietary. In my judgment *Carroll* had the same right, after the deeds of 1757, to the soil of the river, as he would have had to the middle tract of three adjoining tracts of land, after he had conveyed away the tract on each side of it, binding the lines of the conveyances on the middle tract. The argument urged by the appellant's counsel, that the soil of the river passed as an appertenant to the lands conveyed by the deeds, has no weight with me. I cannot think, that the grant in fee of one soil, can carry with it, as a mere appertenant, an estate of inheritance in another soil adjoining to it.

Such are the views I have taken of this subject, and so strongly am I impressed with the propriety of them, that I cannot concur in the opinion of the court pronounced in this case. ·It appears to me the appellant has no title to the land for which he has prosecuted this ejectment in the court below, and therefore I think that the judgment of the subordinate tribunal ought to be affirmed.

JUDGMENT REVERSED, &c.