# THE EDMONDSON ISLAND CASE.

## FURGUSON *v.* HAMLIN.

*(Circuit Court, D. Maryland.* February 4, 1890.)

**1. RIPARIAN RIGHTS—IMPROVEMENTS IN NAVIGABLE STREAMS.**

The United States, for the use of the fish commission, rented an island in the Chesapeake bay from the plaintiff, who was the owner by mesne conveyances from the grantees under a patent from Maryland. The United States was already the owner in fee by deed of a small area of the island, on which it maintained a light-house. During the tenancy certain extensions and improvements were constructed by the United States for the use of the fish commission, extending out into the water on the north and west of the island, consisting of about half an acre, which was solidly filled in, and of certain wharves, crib-work, and inclosures. Upon the termination of the lease the United States removed, onto this newly-made land and extensions, all the buildings which it had erected on the island for the use of the fish commission, and refused to give up possession thereof, claiming title thereto as a structure built in the navigable water of the Chesapeake bay to protect the light-house, and also contended that the plaintiff had no title on which he could recover in ejectment, because of the restrictions of Act Md. 1835, c. 99, limiting the extent to which the island might be extended. *Held,* that by the Maryland act of 1862 (article 54, §§ 44, 45, Code Md.) the patentee of an island in navigable waters of the state has a right to improve out in front of his lands, provided the improvements do not interfere with navigation; that improvements and extensions made by such owner, or by his tenants, belong to him, although they may extend further than the law permits; they may be abated, to the extent that they are unlawful, by proper proceedings, but the ownership cannot be wrested from him, and the premises usurped and used by another; that the same rule is applicable to the limitation imposed upon the extension of Edmondson's island by the Act of 1835, c. 99.

**2. SAME—IMPROVEMENTS MADE FOR PROTECTION OF LIGHT-HOUSE—TITLE TO THE FEE—EJECTMENT.**

As to the title set up by the United States to the *locus in quo,* as a structure made by it in navigable water required for the protection of the light-house, *held* that, as the right of the United States to use the bed of a navigable water without compensation is restricted to the uses of commerce and navigation, it can use the extensions of this island made by it only so far as their use is necessary to maintain the light-house, and not for the purpose of the fish commission; and that, as it appears that the only use of the extensions and structures in question, in connection with the light-house, is to defend it against freshets and ice, the United States is entitled to maintain them for that purpose, and for no other; and that the plaintiff, as the owner of the island, is entitled to such reasonable use of them as can be made without interference with the enjoyment of that easement by the United States. *Held,* that the plaintiff, as the owner of the fee subject to this easement in the United States, is entitled to maintain an action of ejectment, and is entitled to a verdict in his favor for the *locus in quo,* subject to the easement in the United States.

*(Syllabus by the Court.)*

Ejectment.

*Fisher, Cabell & Fisher,* for plaintiff.

*Thomas G. Hayes,* U. S. Dist. Atty., for defendant.

Before BOND and MORRIS, JJ.

MORRIS, J. This is an action of ejectment originally instituted in the circuit court for Harford county, Md. The defendant, William Hamlin, is the agent of the United States, and upon his filing a petition in that court, alleging that the title to the premises was in the United States, and that he was in possession as its employe, and that the United States claimed by a paramount title under the constitution and laws of the United States, the case was removed to this court. The premises

now in dispute are a portion of a small island called "Shad Battery" or "Edmondson's Island," situate in the Chesapeake bay, near the mouth of the Susquehanna river, three or four miles from Havre de Grace, and a little to the eastward of the channel for vessels.   In 1834 a patent was granted by the state of Maryland to Donohue & Gale for this island, in which it was described as containing 2 acres 2 roods and 10 square perches of land, although from the testimony it would appear to have then been merely a shoal spot in the river or bay, upon which a mound of stones had been deposited to make it useful as a fishing station.    In 1835 it was represented to the Maryland legislature that the island might be filled up and improved without prejudice to the navigation of the river and bay, and, there being then no general law permitting riparian owners to improve out into navigable waters of the state, it was enacted (Laws Md. 1835, c. 99) that the patentees might fill up and improve the island, provided they should not exceed the limits described in the patent; and, to prevent the filling up from being extended so as to impede navigation, it was enacted that certain commissioners should lay down and mark the lines and bounds to which the island might be filled up without impeding navigation.   And it was enacted that the filling up might go to the extent fixed by the commissioners, and no further, and the commissioners were directed to return their proceedings to the county court, together with a plat of the lines and bounds as defined by them, to be recorded among the land records of said county.   In 1836 the commissioners made their return, which was duly recorded, in which they gave the metes and bounds and a plat of the premises, which they had determined might be filled up without impeding navigation, describing a rectangular space 321 feet long by 154 feet wide, containing 1 acre and 18 square perches of land, which they certified was within the limits described in the original patent.   In 1853 a small portion of the area laid out by the commissioners, about 45 feet square, was deeded by the then owners to the United States for a light-house site; the deed stipulating that the United States should have free egress, ingress, and regress through and over the residue of the island, to and from the part conveyed, the use of the part conveyed to interfere as little as practicable with the use of the residue as a fishery.   The light-house was built, and prior to 1879 the area of the island was about three-quarters of an acre, which had been inclosed by stone riprapping, with openings for the passage of boats; the space inclosed by the riprapping being some of it bare at low water, but overflowed at high water.

   In 1879 the plaintiff, Major Ferguson, had purchased the island, except the portion deeded to the United States.   He was then assistant to Prof. Baird, the United States fish commissioner.   It was thought that the place was a desirable one for the propagation of fish, and it began to be used, with Ferguson's assent, by the fish commissioner for that purpose.   On June 29, 1883, a formal lease of the island was executed by Major Ferguson to Commissioner Baird, as the agent of the United States, at one dollar a year, renewable from year to year, for three years, for use in catching and propagating fish.   The lessee agreed not to use or

permit the island to be used for gunning or ducking, and not to sublet, and it was stipulated that the lessee might, during the term or within six months afterwards, remove all buildings, machinery, or materials placed thereon by the lessee. This lease continued in force until terminated by notice from Major Ferguson, in 1888. During this period the island was used by the fish commission, and, to facilitate its operations, considerable changes and improvements were made by the United States with the sanction of Major Ferguson. The northern portion of the riprapping was removed, and about one-third of the island excavated, and a fish basin inclosed by crib-work was constructed. Additional crib-work was put down to partly inclose two other fish-basins. Crib-work of considerable length was run out westerly from the north end of these constructions, to act as a defense and protection against the ice coming down the river, and an area of about half an acre was filled in solidly, lying to the north-west, adjoining and connected with the improvements constructed within the lines fixed by the commissioners of 1835, but lying outside of those lines, to the west and north. When by the notice of November 28, 1888, the lease was terminated, the fish commission removed all the buildings it had erected on that part of the island inside of the lines designated by the commissioners of 1835, and placed them upon the half acre made by filling up along-side those lines to the north-west, and the United States now has exclusive possession of and claims title to that made land, and the crib-work surrounding and protecting it. The United States disclaims in this suit any title to any made land and cribs, except that which lies outside of the lines of the commissioners of 1835, and except the 45 feet square light-house site conveyed to it by deed. By written stipulation, a jury has been waived, and the issues are to be determined by the court. The parties have contended for the rulings contained in the following propositions of law submitted by them:

*Plaintiff's Prayers.* (1) The plaintiff's first prayer asks the court to rule that if the land declared for, and not embraced within the disclaimer, was made by the United States for the use of the fish commissioner, while let into possession of the island as the tenant of the plaintiff, then the plaintiff is entitled to recover. (2) The plaintiff's second prayer asks the court to exclude all the testimony offered by the defendant (under exception) tending in any way to impeach the title of the plaintiff to the island.

*Defendant's Prayers.* (1) The defendant's first prayer asks the court to rule that the plaintiff has proved no title to the *locus in quo* sufficient to entitle him to recover. (2) The defendant's second prayer asks the court to rule that the riparian rights granted by the Maryland Code (article 54, §§ 44, 45) to owners of land bounding on navigable waters of Maryland give the plaintiff no right of possession or title to the *locus in quo*, provided it is found to be outside the lines defined by the commissioners of 1835. (3) The defendant's third prayer asks the court to rule that the Maryland Code (Id. §§ 44, 45) gives no title or right of possession to the plaintiff, provided the court finds that the leased premises was originally an artificial island, constructed by the deposit of stone and earth on a shoal in the waters of the Chesapeake, and provided the court finds the *locus in quo* was constructed by the United States on the bottom of said waters, outside of ordinary high-water mark of the fast land, as it existed at the date of the lease. (4) The defendant's fourth

prayer asks the court to rule that, if the *locus in quo* was built by the United States at the bottom of the waters of the Chesapeake outside the ordinary high-water mark of the fast land as it existed at the date of the lease, and that one of the necessary uses of said land and structures is to protect the light-house of the United States on the island from the waters and ice which at certain seasons is liable to overflow the island and light-house, as well as to protect a channel leading from the main channel to the island, then the plaintiff cannot recover.

It is urged by counsel for the United States that the fact that Edmonson's island was originally an artificially made island of itself materially affects the riparian rights of the plaintiff; but, in our opinion, whatever may be the general rule with respect to artificially made islands in navigable waters, after the state by its patent recognized this island as land, and granted it to the patentees as so much land, it became, except as restricted by legislation, like any other land or natural island granted out by the state to private owners. Starting with this proposition, it may be convenient to consider, first, what would be the rights of the parties if the title of the plaintiff was not affected by the act of 1835, c. 99, and the return of the commissioners thereunder limiting the area to which the island might be extended to less than the area of the original grant. In that case, being a riparian owner of land bounding on navigable water, (independently of the fact that his patent covered adjacent land covered by water,) the plaintiff is declared by the Maryland law first enacted in 1862, and now article 54, §§ 44, 45, Code, to be entitled to all accretions to his land by recession of the water, whether made by natural causes or otherwise, in like manner and to like extent as such right might be claimed by the proprietor of land bounding on water not navigable, and as such proprietor he is also declared to be entitled to the exclusive right of making improvements into the waters in front of his land, such improvements and other accretions to pass to successive owners of the land to which they are attached. "But no such improvement shall be so made as to interfere with the navigation of the stream of water into which the said improvement is made." And it is declared that no patent thereafter issued shall impair or affect the riparian rights of such proprietors, and that thereafter no patent shall issue for land covered by navigable waters. *Goodsell* v. *Lawson*, 42 Md. 371; *Garitee* v. *Mayor, etc.*, 53 Md. 432, 433.

In our opinion, therefore, if the restrictive act of 1835 had never been enacted, there could be no doubt but that the improvements made out into the water from the island, if made by a private person, would belong to the plaintiff, and the defense of the United States to this action would have to rest entirely upon its being able to establish that the exclusive possession of the premises in dispute is required to protect and maintain the light-house. It does appear from the testimony that there is at times a considerable flow of ice from the Susquehanna river against the north side of the island, and that after the riprapping and part of the island on that side had been removed by the United States, and the fish-basin constructed where the riprapping had been, the fish-basins and in-closing cribs did suffer from the ice and floods, and that the present

more extended cribbing and the filling in of the new solid area became a proper precaution against a recurrence of the damage. These structures do also necessarily protect the light-house, which needs protection of some sort from the same dangers, particularly on the northernmost side.

But these structures, although built under the direction of the engineers in charge of the improvement of the navigable channels of the Chesapeake, and of the officials in charge of the maintenance of the light-house, were constructed primarily to facilitate the purposes of the fish commission, and so far as they are now used, in the sense of being occupied and held in exclusive possession, they are used solely by the fish commission. The houses removed from the other portions of the island at the termination of the lease, and re-erected on this new-made area, have no use whatever in connection with the light-house, or with commerce or navigation. It was held by this court in the *Hawkins Point Light-House Case*, 39 Fed. Rep. 77, that the United States might erect a necessary light-house in a navigable stream in front of the land of a riparian proprietor who had not only the rights which the Maryland law of 1862 had given him as riparian proprietor, but had also a patent from the state for the submerged land itself, without making him any compensation. But it is a necessary qualification of that rule that the United States can exclude the owner, without making him compensation, to no greater extent than is reasonably necessary for the maintenance of the light-house; and that the United States would have no right to forbid such an owner from making any use of the premises which did not interfere with the easement asserted by it for the public use of commerce and navigation.

If, for example, the riparian owner had, under the state law, an exclusive right to plant and take oysters in the waters surrounding the light-house, he could do so, unless it was injurious to the light-house structure, or interfered with navigation; but the United States could not exclude him from that privilege upon the ground that it interfered with the light-house or navigation, and grant the same privilege to the fish commission. So in this case, if these structures are such that, if made by any private person, they would become appurtenant to the island, and belong to the owner of it, if the United States justifies the construction of them on the ground that they are aids to commerce and navigation, it can only exclude the owner of the island from them to the extent required by the use which is relied upon as the justification of their construction. After erecting the light-house upon the parcel 45 feet square, to which the United States acquired title by deed, it might have discovered that the safety of the light-house required that a heavy wall should be built out in the water so as to surround the island. If such a wall had been built, could it be contended that the United States might say to the owner of the land, "You must not make any use of the wall for landing or drawing seines because it is injurious to the structure," and then proceed to grant that privilege to the fish commission.

It seems to us that, if this was a case of ordinary riparian ownership, the owner of the island would be entitled to the additions to the island.

made by the United States, subject only to the easement vested in the United States for the aid of commerce and navigation. But in this case it is urged by counsel for the United States that by the act of 1835, c. 99, and determination of the commissioners under it, the plaintiff is debarred from acquiring any title to any extension of the island beyond the outlines fixed by those commissioners. It is urged that with regard to this island the special law of 1835, restricting its limits, controls the general law of 1862, which allowed riparian owners to extend their lands into the water, subject only to the restriction that they shall not interfere with navigation, and that as to this island it had been authoritatively determined to what extent the extension might be made without interfering with navigation. But if, under the general law, an extension should be made in such manner as to interfere with navigation, the riparian owner would be none the less the owner of the improvement. He might be liable to indictment for maintaining a nuisance, or to some appropriate proceeding instituted by the state to have the unlawful structure abated, and would no doubt be liable to private actions at the instance of any one who suffered special damage, but meanwhile we do not think he could be ousted by a stranger, or by his own tenant, but might maintain his possession against unauthorized intruders. So with regard to this island, it appears to us that, although the owner had improved out beyond the lines fixed by the commissioners, and had rendered himself liable to similar proceedings requiring its removal, yet, while the improvement or extension remained, he would be under the general law the owner, and could maintain his possession against any private person who attempted to turn him out. *Yates* v. *Milwaukee*, 10 Wall. 497. In *Browne* v. *Kennedy*, 5 Har. & J. 206, the court of appeals of Maryland said:

"All islands, relicted lands, and other increase arising in navigable rivers, belong, in England, to the king, here to the state, where the property in the soil has not been appropriated; but where it has become private property, either by grant or prescription, the same rules do or should apply to it that govern other private property of the same nature. It is subject to the same law of descents, and liable to be transferred by the same mode and form of conveyance, and is subject to none of the rules applicable to lands not granted or distributed out."

See, also, *Giraud's Lessee* v. *Hughes*, 1 Gill & J. 249.

It would appear that, as a fact, the extensions made to the island do not interfere with navigation as they have been constructed by those having charge of the improvement of navigation, and, although, as against the plaintiff, they might, at the instance of the state, be adjudged unlawful, because of the restrictions of the act of 1835, still until that is done, in our opinion, the legal title is in the plaintiff.

With such a legal title to the *locus in quo*, although it is subject to an easement, we think there is no doubt that the plaintiff may maintain this action of ejectment. In *Adams* v. *Emerson*, 6 Pick. 57, it was held that the owner of the soil over which a turnpike road was laid out might maintain trespass against the turnpike corporation for taking the herbage. In deciding this case, the Massachusetts court said:

"The *locus in quo*, although a part of a turnpike road, is the soil and freehold of the plaintiff. He has the exclusive right of property in the land, subject, however, to the easement or rights incident to a public highway, such as the right of passage over it, and the right which the turnpike company has to construct a convenient pathway, and to keep it always in good repair. To accomplish these purposes, the corporation may dig and remove, from place to place, within the limits  \*  \*  \*  for the road, any earth, sand, and gravel, and may dig or cut up sods and turf; but it by no means follows that the corporation has the right of herbage which is the exclusive property of the owner of the soil, as well as all trees, mines, etc. The corporation has no right of property in the land, but only a servitude or easement, and this does not clash with the plaintiff's exclusive right of property in the land. \*  \*  \*  It was once doubted whether ejectment or other real action would lie for the soil of a road or highway, because it was said full seisin could not be delivered, and a dictum of Lord HARDWICKE was quoted to that effect, in the case of *Goodtitle* v. *Alker*, 1 Burrows, 133; but that doubt was removed by the decision in that case, and very clearly it had no foundation in principle."

The same doctrine had been previously held by the same court in *Robbins* v. *Borman*, 1 Pick. 122, and was reaffirmed in *Perley* v. *Chandler*, 6 Mass. 454, in which the court said:

"The soil and freehold remain in the owner, although incumbered with a way; and every use to which the land can be applied, and all the profits which may be derived from it consistently with the continuance of the easement, the owner may lawfully claim. He may maintain ejectment for the land thus incumbered, and, if the way be discontinued, he shall hold the land free of the incumbrance."

In our judgment, the plaintiff is entitled to a verdict and judgment for the premises declared for, subject to the easement in the United States to make such use thereof as is necessary for the protection of the lighthouse. Having reached this conclusion without reference to the questions growing out of the relation of landlord and tenant, we do not find it necessary to rule upon the prayers in which the contentions of the plaintiff based upon that aspect of the case are stated, but it is evident that the familiar rule that a tenant cannot be held to dispute his landlord's title must, so far as it is applicable, strengthen the plaintiffs' case, and tend to support the conclusions at which we have arrived.

BOND, J., concurs.