GIRAUD's Lessee *vs.* HUGHES, *et al.*—*December*, 1829.

It is true as a general principle, that the lines of a tract of land originally run by course and distance, without calls, must be confined to the course and distance, and cannot be extended beyond them.

Where a tract of land lies adjacent or contiguous to a navigable river, or water, any increase of the soil, formed by the water gradually, or imperceptibly receding, or any gain by alluvion in the same manner, shall, as a compensation for what it may lose in other respects, belong to the proprietor of the adjacent or contiguous land. It is not upon the principle that the land calls for the water, but, because it adjoins the water, that the owner acquires a title to the soil so formed.

In ejectment it appeared that the land for which the action was brought, and which had been recently patented as vacant land, had been formed by the gradual recess of the waters on the shores of the river *Patapsco ;* and that another tract of land the lines of which ran into, though they did not call for the water, where the recession took place, had been patented many years before. The defendant claiming title under the grant of this last tract, HELD that the action could not be sustained.

The Port Wardens of *Baltimore* by the act of 1783, ch. 24, were authorised to grant permissions to make wharves, but in order to vest a title in any such wharf, it is essential by the provisions of the act of 1745, ch. 9, sec. 10, that the grantee should have completed it according to his permission.

VOL. I.—32.

APPEAL from *Baltimore* County Court. Ejectment for a tract of land called *Augustus's Discovery Resurveyed.* The defendants (now appellees) took defence on warrant, and plots were returned. Not guilty was pleaded and issue joined. The plaintiff made claim and pretension for all that tract or parcel of land, called *Augustus's Discovery Resurveyed,* as located on the plots.

The defence was taken under the patent of a tract of land, called *Gist's Inspection,* and for certain land lying between the 9th and 10th lines of said tract, as originally surveyed, and the present shores of the river *Patapsco,* which land was covered by the plaintiff's claim. This action was originally instituted against *Christopher Hughes,* and upon his death, his heirs at law, the present appellees, were made defendants.

The plots returned and filed in this cause, showed that the 9th and 10th lines of *Gist's Inspection,* (being on the N. E. corner, and *Eastern* side of said tract) according to their original location, run into the water of the river *Patapsco :*—That the part of said tract conveyed by *J. M. Porter* to *Christopher Hughes,* was also adjacent to the water, and of, the *Northern* and *Eastern* parts of the whole tract :—That the part of *C. Hughes'* purchase which he conveyed to *Leonard Harbaugh,* was in fact bounded by the waters of the *Patapsco* on the N. and E., by *Montgomery* street on the south, and by *Hughes'* purchase from *Porter* on the *West :*—That a certain permission which the *Port Wardens of Baltimore* in the year 1786, granted to *Leonard Harbaugh* to make a wharf, commenced to the N. and W. of his purchase from *Hughes* (at the beginning of *Hughes'* purchase from *Porter,* and at the *East* side of *Henry* street) and extended from such beginning, first N. then E. (being to the *North* of one of the lines of the lot which *C. Hughes* then owned, and extending nearly parallel with and along its whole *Northern* front on the river) then *South,* and then *West,* until it reached the shores of the *Patapsco* at the S. E. corner of *Harbaugh's* lot, and the intersection *North* side of *Montgomery* street with the water :—that the said wharf, as far as actually constructed, did not include more of the shores of the *Patapsco* than were immediately adjacent to the water lines

of *Harbaugh's* lot, purchased from *Hughes;* and was much less extensive than the permission from the Port Wardens, not extending either so far *North* or *West* as the lines of that permission purported to authorise:—That the tract of land called *Augustus's Discovery Resurveyed*, lay to the N. and E. of the 9th and 10th lines of *Gist's Inspection*, and clear of those lines and clear of that tract as originally run according to the courses and distances of the patent—that *Augustus's Discovery Resurveyed*, covered a considerable part of the space, included in the lines of the permission of the *Port Wardens* to *Harbaugh*—That the shores of the river *Patapsco*, when the action was brought, ran along those outlines of *Augustus's Discovery Resurveyed*, which are adjacent to the water—and that the shores of the said river had in fact been extended from *West* to *East*, the distance from the *East* outlines of *Gist's Inspection*, to the *East* outlines of *Augustus's Discovery Resurveyed*, since *Gist's Inspection* was originally surveyed.

1. At the trial the plaintiff gave in evidence a patent to himself for the tract claimed by him, dated in 1813, and proved its location on the plots, to be correct—and he also proved that *Augustus's Discovery Resurveyed*, according to its true location, ran clear of the *original* lines of *Gist's Inspection*, which was the elder tract. And that the tenth line of *Gist's Inspection*, mentioned and called for in the said patents, was correctly located on the said plots—that the beginning of a tract of land called *Augustus's Discovery*, was correctly located, and that the beginning of the tract of land called *Augustus's Discovery Resurveyed*, was also correctly located, and that the beginning of both of the said tracts is in the said tenth line of *Gist's Inspection*. And he also offered in evidence a patent for the tract of land called *Gist's Inspection*, bearing date on the 9th of July, 1732, which contained no call for the waters of the *Patapsco*—that it is correctly located—and that *Montgomery* street is correctly located upon the plots. The defendants then proved that one *John Mercer Porter*, on the 6th of June, 1782, was seized in fee simple of the said tract of land called *Gist's Inspection*, at which time he conveyed to *Christopher Hughes* part of the

said- land, the lines of which part on the north and east sides, in fact, ran into the river *Patapsco,* and offered evidence that the same is truly located—and also gave evidence, that the said *Hughes* took possession under said deed of the land so conveyed to him. The plaintiff then read in evidence a lease from said *Hughes* to one *Leonard Harbaugh,* for part of the said *Hughes,* the defendants purchase, from *Porter,* lying adjacent to the water on the *north-east* and *eastern* lines thereof, leaving the said *Hughes,* however, one line on the *north side* of his lot purchased from *Porter,* adjacent to the shores of the river *Patapsco*—And that the said *Harbaugh,* in the year 1786 or 1787, commenced the building of a wharf at the said lot, and continued working at the same till the year 1789, when he quit working there, and abandoned the property; and that said *Hughes* then took possession of the same, and by himself, his tenants, and the defendants his heirs at law, have held it ever since; and that the said *Harbaugh* had laid and extended the logs of said wharf as the same are located on the plots, and had the same filled up in the middle and north side thereof, and partly so on the east and south part of the same; that the logs of said wharf, so made, have by injuries and decay in several parts, fallen down, (the top log entirely around,) and have not been repaired since; that part of the ground filled up within said logs, has been, and still is used and occupied as a Distillery of Turpentine, and that the water flows all around over the logs of said wharf, and within the same from ten to twenty feet according to the state of the tides. The defendants then offered evidence by *William Patterson* and *Samuel Smith,* witnesses sworn and examined, that they were members of the *Board of Wardens* for the port of *Baltimore Town,* in the years 1785 and 1786, and for some time after—that all the other members of the said board, at that time, as also their then clerk, are since dead. That the said board had, at that time, a common seal, which had been adopted, and was used by the said board, that it was the general custom and practice of the board, to direct and have their official acts or proceedings, when given out to individuals, regularly signed and attested

under the seal aforesaid, that they have no knowledge what has become of the said seal, or whether it is in being at this time or not. And also offered evidence by *John Purviance*, Esq. that he was clerk to said *Board of Wardens* in the year 1795, and for some time previous; that the said Board, during the time of his being clerk, had and used a common seal to attest their official acts and proceedings, which he understood and believed to be the same which the Board first adopted. That when he resigned his clerkship, the said seal, with the books and papers of the Board, were given over to his successor—And also proved by the same witness that one *Samuel Vincent*, who is now deceased, was the last clerk to the said Board, whose powers ceased in the year 1797, when the act incorporating the *Mayor and City Council of Baltimore*, went into effect and operation. And also proved by the same witness, that *Richard Moale*, who was the first Register, and *James Calhoun*, who was the first Mayor, have both been dead several years. And also offered in evidence by *Emanuel Kent*, examined as a witness, that he is and has been, for about two years past, the Register of the City of *Baltimore*, and as such Register it belongs to him to have the care and keeping of the public books, papers and proceedings of or belonging to the Mayor and City Council of *Baltimore*, and also those of the former Boards of Commissioners of *Baltimore Town*, the special Commissioners and Wardens of the port of *Baltimore Town*, and the seals of the said Commissioners, if any are in being. That he has no knowledge of the seal used by said Board of Wardens—that he hath never seen it—that he hath enquired and examined for the said seal in his office, and it cannot be found there or any where else, that he knows of, and also proved by the said witness, that a book which he now produces, came into his care and keeping as Register, when appointed, from his predecessor in office, and is one of the public books of the Mayor and City Council of *Baltimore*, and is by him believed and considered to be what it purports to be, a book containing the proceedings of the former Board of Wardens of the port of *Baltimore Town*. And also proved by the said witnesses, *Patterson, Smith* and *Purviance*, that the said book is the

original book that was kept by the said Board of Wardens, in which were made and contained minutes and entries of their acts and proceedings.    And also proved by *John Eager Howard*, that the said *Leonard Harbaugh* removed from the State of *Maryland* to the City of *Washington*, in the year 1791, where he resided until his death, two years or more since, except about two years whilst he was in *Frederick* county, and for a short time in *Baltimore*, and returned to *Washington*.    The defendants then offered to read in evidence the following entries made in the said book, to wit:  "At a meeting of the Wardens of the Port of *Baltimore*, July 5th, 1785, present *Samuel Smith, Richard Ridgley, John Sterett, William Patterson, Samuel Purviance*, Chairman—the board received the application of Mr. *Leonard Harbaugh* for permission to extend a wharf on *Luns' Point*, according to the plan annexed to his petition, which was read and ordered to lie for further consideration."   "At a meeting of the Board of Wardens for the Port of *Baltimore*, September 28, 1786, present *Samuel Purviance, William Patterson, Samuel Smith, Thomas Russell, Thomas Elliot, Daniel Bowly*, the board having taken into consideration the application of *Leonard Harbaugh*, for extending his wharf on *Luns' Point*, agree that he be permitted to extend the same to the following courses and lines laid down as limits, viz: Beginning at a stone set up at the present waters edge at the east side of *Henry* street, marked C, H, No. 45, and running north two degrees, west eight perches, then north eighty-eight degrees, east twenty-eight perches, then south fifty-six degrees thirty minutes, east ten perches and one quarter of a perch, thence south thirty-nine degrees forty minutes, east ten perches and one quarter of a perch, thence south twenty-three degrees, east ten perches and one quarter of a perch, thence south ten degrees fifteen minutes, east five perches and a half a perch, thence south eighty-eight degrees, west parallel with the second line until it intersects the shore on the north side of *Montgomery* street,—ordered that permission be granted accordingly,"—As the best evidence now to be had of the matters set forth and contained in the said entries, and for the purpose with the other evidence of the better

enabling and authorising the jury to presume and find that permission as stated in said last entry, had been in due form of law granted by the said board to said *Harbaugh*, to build a wharf as therein stated—And also proved that the lines of the permission in the said entry mentioned are truly located on the plots. The plaintiff objected to the admission of the said entries in the said books as evidence, and did also object to the admission of all the said parol evidence about the said seal, and did then and there assert before the court, that the said evidence was not proper to go to the jury. But the said court [Hanson and Ward, A. J.] did then and there declare and deliver their opinion that the said evidence, on the part of the defendants, ought to be admitted, and did permit and suffer the same to go to the jury. The plaintiff excepted.

2. The plaintiff in addition to the matters contained in the *first* bill of exceptions, further offered in evidence, a verdict and judgment rendered between the same parties in this court at the present term for a part of the hereinbefore mentioned tract or parcel of land called *Gist's Inspection.* The defendants then in addition to the matters before offered in evidence by them, proved that from fifty to fifty-five years ago, the shore of the basin of Baltimore, passed at common tides as located on the plots in this cause, in the most western position of said shore, from a small plank enclosure on the south side of *Montgomery street*, standing at the east end of a brick distillery of the lessor of the plaintiff, and running thence northwardly near a pump now standing, and thence passing between two stones on the north side of *Hughes street*, at the intersection or corner of that street and *Leonard street*, which several objects were pointed out by the witnesses to the surveyor in making the survey in this cause. And they also proved by a certain (*Gould*) that he when a boy, had paddled about in a canoe on the shoal water of the said basin, at or near where said pump now stands. It was then admitted by the parties, "that the several water lines or shores located by either party in this cause, show and designate where the tide water of the *Patapsco river* or basin of *Baltimore* flowed at different periods of time, *receding gradually eastwardly to where*

*the same now are shown by the most eastward location thereof,* on the plots, and that the lines of *Gist's Inspection* when the same was granted, including part of the sixth line thereof, from the end of said line, ran into the water of the *Patapsco* or basin of *Baltimore Town,* to the end of the tenth line thereof; and that the above lines are so located, except a small part of the south end of the tenth line." The defendants then prayed the court to instruct the jury, that if they believed the matters so offered in evidence, the plaintiff was not entitled to recover. Which instruction the court gave. The plaintiff excepted ; and the verdict and judgment being against him, he appealed to this court. ·

The cause was argued before BUCHANAN, Ch. J. and EARLE and STEPHEN J.

*Learned,* for the appellant contended, 1. That the appellant (the plaintiff below) derives his title to the land in dispute from the *State of Maryland,* in whom the title was at the time of the grant to his lessor.

2. That the patent for *Gist's Inspection,* under which the defendants claim to hold said land, contains a course and distance location only, and the land in dispute lies entirely without the lines of that tract.

3. That the defendants cannot extend their lines of the tract of land called *Gist's Inspection,* so as to take in any alluvial formations, without the lines of said tract according to its course and distance location, as laid down upon the plots. The patent not having called for the water in a single point.

4. That the lines of the deed from *Mercer Porter* to *Hughes,* for a part of the tract of land called *Gist's Inspection,* cannot pass a title to any land lying without the lines of the whole tract, according to its course and distance location; but that the second line of *Porter's* deed to *Hughes* must terminate at the outlines of the original tract.

5. That land covered by navigable water belongs to the State, and is the subject of a grant; subject however to the common use of fishing and navigation, &c.

6. That there is no alluvial formation appurtenant to the land in dispute in this cause, to which the defendants can claim title as riparian proprietor, so as to enable them to follow the recession of the water of the basin.

7. That by the act of Assembly the permit of the Port Wardens of *Baltimore*, to build a wharf, was contingent in its effects, and did not divest the State of its title to the land covered by the permit, but in the event of the completion and maintainance of a wharf, that should be a permanent and beneficial improvement.

8. That the wharf mentioned in the proceedings in this cause was never completed, and is not such a permanent and beneficial improvement, as by the act of Assembly, will vest a title in fee in the land embraced in the Port Wardens' permit, in the maker of said wharf, and those who may claim under him.

9. That the defendants having caused the tract of land called *Gist's Inspection* to be located by metes and bounds, under a commission obtained by their ancestor for that purpose, are now estopped from extending the lines of said tract of land, so as to take in other land lying. without the lines of said tract, at the time said commission was executed.

10. That the title to the land in dispute, out of the plaintiff, on which the defendants rely in their defence, is not such a title in the defendants or a stranger, as is sufficient to prevent the plaintiff from recovering.

The grant for *Gist's Inspection,* dated the 9th of July 1732, has no calls in it, but all the lines are course and distance. When the survey was made the courses ran into the water, and the grant was for land covered by water. The points arising in the *first* bill of exceptions are waived for the present. On the *second* bill of exceptions the material questions arise. It has been decided by this court that the title to lands covered by navigable water remains in the State. *Brown vs. Kennedy,* 5. *Harr. & Johns.* 195. Land so situated remains so until granted by the State. Has this land been granted by the State? We contend that it was not until it was granted to the lessor of the plaintiff. This tract lies without the lines of *Gist's Inspection;*

and *Gist's Inspection* must be located course and distance; and so located, it does not interfere with the land granted to the lessor of the plaintiff. There is no call to the river in the grant of *Gist's Inspection.* It cannot, therefore, bind on the river. Imperative calls are to be gratified, and course and distance disregarded. This is settled law. When the grant of a tract of land is by courses and distances only, the grantee cannot take alluvial formations. All such formations belong to the State, unless granted to another by the State. The proprietary abolished calls in all grants, in order to prevent more land being included in any grant than the party paid for and contracted to purchase. The evidence in this cause shows that there were no alluvial formations. *Harbaugh* had permission from the Port Wardens to make a wharf, which he commenced and worked some time on it, but finally abandoned it. The ancestor of the defendants then took possession, having before then leased the adjoining property to *Harbaugh.* By that lease he located his land; and where a location is made by a party, he is estopped from denying it. *Ridgely's Lessee vs. Ogle & Leonard,* 4 *Harr. & McHen.* 123. Upon *Harbaugh's* abandonment, the land reverted to the State, and *Hughes* had no right to interfere with the wharf. He was a trespasser upon the property of the state. *Act of Assem.* April, 1783, *ch.* 24, *sec.* 9. The acts of Assembly vesting powers in the Port Wardens to grant permission to erect wharves, contemplated permanent and beneficial improvements. The wharf commenced by *Harbaugh* and abandoned, was not a permanent or beneficial improvement. It was suffered to go to ruin. His contract, therefore, was void on his abandonment. Until such contract is fully complied with, the land continues in the State.

*R. Johnson,* for the appellees. The questions which arise upon the title and proof, are,

1. Whether or not the defendants are entitled, under the doctrine of alluvion, to all land added to *Gist's Inspection?*

2. Whether or not such a title is shown, under the permission given to *Harbaugh*, to erect a wharf, in the greater part of the land in question, as will prevent the plaintiff from recovering?

1. There can be no extension of the lines of *Gist's Inspection* farther than they will go by the courses and distances expressed in the grant. But the question of alluvion depends upon that tract of land lying on the river. It seems that a considerable part of *Gist's Inspection*, at the time of the grant, was covered by water. The claim under that grant, in the absence of the doctrine of alluvion, is for all that part which was so covered by water at the time of grant, but which is now, by the recession of the water, become firm land. The right of a person to alluvion, having land bounding on the sea, has been considered to be a common right. There is no difference whether the tract of land called for the river or not, the right to alluvion is the same. The right is given upon the principle, that he might lose land by the washing of the shore by the river. 2 *Blk. Com.* 61, 66, 261, 262. 5 *Bac. Ab. tit. Prerogative* (B) 495. This doctrine is not made to depend upon the grant of the land calling for, and binding on the river; but upon the fact only of the land lying adjoining the river. The point could never arise, if the land called for and to bind on the river,—for in such a case, wherever the river went, the land would go with it. But the right is given to the proprietor of the adjoining land, because his land does not, by its lines, call to bind on and with the water. It is, therefore, only necessary for the defendants to show, that their land did adjoin the river, at the time it was granted.

The doctrine of estoppel cannot operate in an action of ejectment as to the locations made of the same land in another action of ejectment, even if between the same parties. Here the plaintiff has not counterlocated the location made by the defendants of *Gist's Inspection*. The evidence is, that the water run in a particular manner, until it gradually receded to where it now runs from, O to B, to 5 to V, leaving land formed by accretion. This is admitted in the bill of exceptions, and does away the effect of *Harbaugh's* wharfing out a part of it.

If this gradual increase of the land was by the recession of the water, in conjunction with the acts of *Harbaugh*, still the doctrine of alluvion will attach. *Adams vs. Frothingham*, 3 *Mass. Rep.* 352. For a part of the land at least, there has been a gradual accretion, independent of the acts of *Harbaugh*.

2. The defendants are entitled, under the permit to *Harbaugh*, to build a wharf. But it has been said that *Hughes* was a trespasser. Suppose he was, it was nothing to the plaintiff. It was only necessary for the defendants to show that the State had parted with its title to the land. The Port Wardens had no authority to give permission to *Harbaugh*, to wharf out in front of *Hughes's* land, so as to deprive him of his water right. The wharfing privilege was to be given to the owner of the land, in front of which the wharf was to be made. Act of 1745, *ch.* 9, *sec.* 10. The lease from *Hughes* to *Harbaugh* was only of a temporary interest. When is the improvement perfected so as to vest the property in the improver? There is nothing to show but that the wharf erected by *Harbaugh*, did answer all the purposes for which it was intended. It will not be said, that if the wharf had been completed, but is now in a ruinous state, it would divest the title out of the improver. There was an improvement made, even if the wharf was not completed. If the permission granted, was not complied with, it was the duty of the Port Wardens to have it destroyed, as a nuisance. Act of April, 1783, *ch.* 24. The presumption is, that the permit to build the wharf, was complied with. When *Hughes* took possession after *Harbaugh's* abandonment, the right became his. He was not bound to complete the wharf. All *Harbaugh's* rights were vested in *Hughes*. After the act of April, 1783, *ch.* 24, this kind of property and right were placed under the control of the Port Wardens, and the land office had no right to grant a warrant to affect any land so placed. All the right of the State, if it had any, was vested in the Port Wardens; and by the act of 1796, *ch.* 68, is vested in the corporation of *Baltimore*. Could not *Harbaugh* transfer his right to another; and could he not abandon in favour of *Hughes?* It will be presumed that he had regularly abandoned in favour of *Hughes*.

*Mitchell,* on the same side. When *Gist's Inspection* was surveyed and granted, as all the deeds offered in evidence recognize, the tract of land ran with the edge of the river. The common law doctrine of alluvion is the civil law of alluvion. *Harg. L. T.* 28. *Abbot of. Ramsay's case,* 3 *Dyer,* 326. *b.* The State never had the right of alluvion. It is an increment of rivers subsequent to possession being taken by the sovereign. It cannot be appropriated or granted to any person, being imperceptible. If. it was perceptible it might be granted, but being imperceptible it accrues to the adjacent soil. If an island appears in the sea, the sovereign may take possession of it. *The King vs. Lord Yarborough,* 10 *Serg. & Lowb.* 19. At what time did the right of the State, if any, accrue to this alluvion? The right of the public to navigable rivers, is no longer than any such river is covered by water. When it is no longer a public river, but has become land, it belongs to the owner of the adjacent soil, whether his grant for his land called to bind on the river or not. This case is not similar to *Brown vs. Kennedy.* This is a case of dereliction, not a filling up. *Harg. L. T.* 28. *Abbot of Ramsay's case,* 3 *Dyer,* 326. 2 *Blk. Com.* 261. 5 *Bac. Ab. tit. Prerogative* (*B.* 3,) 498. *The Batture case,* 5 *Hall's L. J.* arguments of *Jefferson* and *Livingstone,* 26, 27, 60, 63, 42, 46, 146, 147, 148, 149, 160, &c. *Smart vs. Dundee,* 8 *Bro. Parl. Cas.* 119. *Poth.* 19, 20. *Vattel, B.* 1 *ch.* 22, *sec.* 5, page 121. The right to the adjoining water passes as an appurtenance in all grants of land. This gave a right to the holders of adjoining lands to build wharves in *Baltimore,* if it did not obstrust the navigation of the river. The acts of 1745 and 1783, took away all the State's right and vested it in the Port Wardens; and they were the judges whether or not *Harbaugh* had complied with the permission granted to him to build a wharf. If *Hughes* was the riparian proprietor both before and after his lease to *Harbaugh,* the State had no right to divest him of such right. After *Harbaugh* abandoned, the rights of *Hughes* were reinstated, and he was clothed with all *Harbaugh's* rights, who could not acquire a

fee simple right against *Hughes*.. See 2 *Hall's L. J.* 434, and 4 *Hall's L. J.* 517.

The verdict in the former ejectment did not affect the question as to the land now in dispute. Here the defendants, and those under whom they claim, have had long and uninterrupted possession; and the presumption is that the water belonged to them. *Bealey vs. Shaw,* 6 *East.* 213.

*Learned,* in reply. The question is whether or not land formed by alluvion, vests in the proprietor of the adjoining land?

1. As to the effect of the grant of *Gist's Inspection*—it incorporates the terms and conditions under which the grantee held the land. Calls were excluded. *Kilty's Land Hold. Ass.* 228, 229. The condition of the grant was, that there should be no calls, but that each line was to run course and distance from the beginning. The grantee was then bound by course and distance location, and could not bind on, and run with the river. Lands here are not held as they are in *England.* There it is a prerogative right, but here all lands are passed by grant and held in fee. The whole province was originally granted to the Lord Proprietary. He granted to individuals, and what he did not grant, remained in him, and now in the State. Lands are not held here by fiction of law, but they are held under grants, which are differently construed from those in *England.* Our courts have said, that course and distance are to be the location, where there are no calls; but if there are calls, they are to be gratified, and course and distance not to be regarded. Is this so in *England?* Where the adjacent proprietor of the soil, by his grant, calls for and binds on the river, then he is entitled to all alluvion; but if his grant has no such call, he has no right to alluvion. *Vattel, B.* 1. *ch.* 22, page 121. 2 *Blk. Com.* 261, 262. *Brown vs. Kennedy,* 5 *Harr. & Johns.* 195.

2. Alluvion must be imperceptible, &c. and if not, the land formed otherwise belongs to the sovereign power, and does not vest in the riparian proprietor.

3. There was not such an improvement made by *Harbaugh* as the act of Assembly contemplated; and this court from the

evidence, is competent to judge of that fact, and apply the law to it. The evidence is that the wharf was not completed—only part of it was built, and then it was abandoned. There is no evidence that it was ever used as a wharf for any purpose.

STEPHEN, J. delivered the opinion of the court.

This action was instituted in *Baltimore* County Court, to recover a parcel of land called *Augustus's Discovery Resurveyed*, which was patented to *John James Giraud*, as vacant land, and whether it was vacant or not at the time he caused it to be resurveyed, is the question now to be determined, and in order to ascertain this question it becomes necessary to decide what was the true location of *Gist's Inspection*, patented to *Richard Gist*, on the 9th of July, in the year 1732, that is, not how it was originally located, but what was its true position at the time of *Augustus's Discovery*, and the resurvey upon *Augustus's Discovery* were taken up. It is admitted that *Gist's Inspection*, when it was surveyed and patented, ran into the water or basin of *Baltimore;* since that time the water has gradually receded, and the land formed by the recession of the water, is the land upon which *Giraud* made his survey of *Augustus's Discovery* in the year 1812, and his resurvey, in the year 1813. In the course of the trial, the parties made the following admission: "It is admitted that the several water lines or shores located by either party in this cause, shew and designate where the tide water of the *Patapsco* river or basin of *Baltimore*, flowed at different periods of time, receding gradually eastwardly, to where the same now are shewn by the most eastward location thereof, in blue shaded lines, and that the lines of *Gist's Inspection*, when the same was granted, including part of the sixth line thereof from the end of said line, ran into the water *Patapsco* or basin of *Baltimore Town*, to the end of the tenth line thereof, and that the above lines are so located, except a small part of the south end of the tenth line." It has been contended that as the lines of *Gist's Inspection* were originally run, course and distance, when the survey of it was made, and had no call to the water, it must be confined to its course and distance, and cannot be extended be-

yond them. This position is true as a general principle in exposition of grants; but the question is not here what was the true original location of *Gist's Inspection* at the time it was surveyed, but whether under the circumstances of this case, the defendants are entitled to the adjacent land formed by the waters having gradually receded in an eastern direction. *Christopher Hughes,* the father of the defendants, held a part of *Gist's Inspection,* and the deed under which he claimed title to it, describes it as running into the water; that deed bears date the 6th of June, 1782. The principle seems to be well settled, that where a tract of land lies adjacent or contiguous to a navigable river or water, any increase of soil formed by the waters gradually or imperceptibly receding, or any gain by alluvion in the same manner, shall, as a compensation for what it may lose in other respects, belong to the proprietor of the adjacent or contiguous land. For this principle, see *2 Blk. Com.* page 261, where he says, "as to land gained from the sea, either by alluvion by the washing up of sand and earth, so as in time, to make terra firma, or by dereliction, as when the sea shrinks back below the usual water mark; in these cases the law is held to be, that if this gain be by little and little, by small and imperceptible degrees, it shall go to the owner of the land *adjoining.*" It is then not upon the principle that the land calls for the water, but because it adjoins the water, that the owner acquires a title to the soil so formed, for, continues he, *de minimis non curat lex;* and besides these owners being often losers by the breaking in of the sea, or at charges to keep it out, this possible gain is therefore, a reciprocal consideration for such possible charge or loss; here we have in plain and strong language, the reason of the rule, which places the acquisition of the additional soil by the owner of the adjoining land, upon the ground, that he might be a loser by the breaking in of the sea, or at an expense to keep it out. And to bring the case within the operation of the rule, it is only necessary that the land should be adjoining the water. To the same effect is the law laid down in the 5th vol. of *Bacon's Abridgement,* page 494, *title prerogative;* the principle is there stated to be, that

if the sea leaves any shore by a sudden falling off of the water, such derelict lands belong to the king, but if a man's lands *lying to the sea*, are increased by insensible degrees, they belong to the soil adjoining. Here, too, it appears only to be necessary, that the land should be adjoining to the sea, to entitle its owner to the derelict land formed by the recession of the water. It appears by the proof in the cause, that *Harbaugh* who obtained from the Port Wardens in *Baltimore*, a permission to make a wharf, never did complete it according to such permission, but after proceeding in the work for some time, totally abandoned it. This permission he obtained from the Board of Wardens who were authorised to grant it by the provisions of the act of 1783, *ch.* 24, but in order to vest a title in such wharf, it appears to be necessary that he should have completed it. This appears to be essential by the provisions of the act of 1745, *ch.* 9, *sec.* 10, by which it is enacted, that "all improvements, of what kind soever, either wharves, houses or other buildings, that have or shall be made out of the water, or where it usually flows, shall (as an encouragement to such improvers,) be forever deemed the right, title, and inheritance of such improvers, their heirs and assigns, forever." Neither *Hughes* nor *Harbaugh* therefore, acquired any title to the work done by *Harbaugh*, in virtue of his permission, but it being expressly admitted by the parties, that the water gradually receded to where it now flows, it is upon the ground of such gradual recession, by which the derelict land was formed, that *Hughes* and those now representing him claim title to it. The counsel for the appellant having waived the points arising on the first bill of exception, it is not deemed necessary to give any opinion upon it.

JUDGMENT AFFIRMED.