## SWEETZER LINTHICUM vs. MARGARET COAN, (otherwise called MARGARET CONE,)

*Alluvion—Riparian proprietor—Ejectment—Grant from the State.*

In 1763, a patent was obtained for a tract of land in Baltimore County, which was called Leicestershire, and was bounded for a considerable distance by the Patapsco River. In 1831, the title to a portion of this tract became vested, by regular *mesne* conveyances in H. L.; and in 1856, a part of the portion conveyed to H. L. was duly conveyed to M. C., and this part had the Patapsco River as one of its boundaries. In 1861, S. L. obtained a patent for a tract of land named "Linthicum's Comet," which was covered entirely by the waters of the Patapsco; and according to its location by course and distance, it was bounded by the lines of Leicestershire where the latter tract bordered on the river; the lines of the two tracts at this boundary strictly conforming to each other. Along the river boundary of the land of M. C. and running toward the channel of the Patapsco, a considerable body of land had been formed where the water formerly flowed; and this accretion lies within the lines of "Linthicum's Comet." In May, 1884, an action of ejectment was brought by S. L. to recover this land of M. C. The plaintiff gave evidence that tended to prove that at the date of the patent for "Linthicum's Comet," the river at ordinary high-tide overflowed all the land in question, and that a portion of it began to be formed some years after 1860, and the formation of land commenced from the edge of the main channel of the river, and did not make outwards from the fast land on the shore. The evidence on the part of the defendant contradicted this testimony, and tended to prove that the river had been gradually filling up from the bank on the Baltimore County side toward the channel, since 1846 or 1848, and that the flats and marsh on the bank of the river in 1854, were nearly in the same condition as at present, except that at that time they were not so solid as they are now. It was also in evidence on the part of the plaintiff that there was a great freshet in the river in or about the year 1868, which filled up the bed of the river very much, and deflected the main channel from its original course toward the Anne Arundel shore, and made a

deposit of from fifteen inches to two feet of mud on the premises described in the declaration. HELD:

1st. That if the land in question was formed by gradual accessions extending from the shore into the river, it would belong to the defendant, the riparian proprietor, and this would be the case notwithstanding the fact, that by the influence of floods and freshets large deposits of mud might have been made in the bed of the river. But if the land was formed in the river and extended inward towards the shore, it would be the property of the plaintiff, with all its accretions.

2nd. That the Commissioner of the Land Office in issuing a patent to S. L. merely sold the State's interest in the land. He could not thereby diminish or abridge the rights of the riparian owners. The patent was simply a grant of land, and this grant was made subject to all existing rights.

APPEAL from the Circuit Court for Baltimore County.

The case is stated in the opinion of the Court.

*Exception.*—The plaintiff prayed the Court to instruct the jury as follows :

1. If the jury find from the agreement of counsel, and from the evidence in the cause, that before and at the time of the date of the special warrant mentioned in the patent offered in evidence by plaintiff, the Patapsco River was a navigable river, in which the tide ebbed and flowed, the soil and bed of said river belonged to the State, and the State had the right to grant the farm ; and if the jury find that the State by the patent offered in evidence, did grant the soil and bed of said river to plaintiff, and that the lines of said patent include the lands mentioned in the declaration, and located as the plaintiff's claim and pretensions on the plats, and that the same are truly located thereon, the plaintiff has title *prima facie* to the soil and bed of said river, as far as the lines of his patent run, and are clear of the older survey of Leicestershire, though the

water of the river may have retired from a portion of the same ; and the burden of proof is upon the defendant to show by locations and evidence, that at the time of the grant, date of the special warrant aforesaid to plaintiff, the shore of said river on the Baltimore County side, at the lines of ordinary high tide, was within, and if within, how far it was within the lines of plaintiff's patent, and of the lands mentioned in the declaration, and that after said grant to plaintiff, all accretion or alluvion to the property of defendant and her predecessor in title, upon or over, or within the lines of plaintiff's patent as aforesaid, was intercepted or barred by said patent.

2. That by alluvion, is meant in law dry land, slowly, gradually and imperceptibly added day by day to the *terra firma* of the shore of the river, and permanently projected above the water beyond the limits of ordinary high tides on said shore, and so as that the boundaries of the said shore and the adjoining land are so indistinguishable, that it is impossible to discover the slow and gradual changes which from time to time are accruing, and where, at the end of a long period of time, though it is evident there has been a considerable gain from the shore, yet the exact amount of it from the want of some mark of the original boundary line, cannot be determined; but that where the limits of a riparian proprietor's lands are clear and definite, and the exact space between those limits and the new high water line can be clearly shown, although from day to day, or even from week to week, the progress of the accretion is not discernible, a riparian proprietor is not entitled to any accretion which may have been made between those clearly defined limits and the new high water line, and that there is evidence in this case from which the jury may find that the original boundary line of the shore is clear and definite, and that the exact space between that original boundary line and the present high water line can be clearly shown ; and the plaintiff is entitled to recover.

3. That the rule as to alluvion being the imperceptible nature of the acquisition, if the jury believe from the evidence that a considerable quantity of soil was in fact accumulated, and was perceived to have been accumulated and deposited after any of the freshets in the Patapsco River testified to, if they shall find such freshets, or any of them, occurred upon the lands mentioned in the declaration, and that by the operation of any of said freshets the channel of the river was deflected a measurable distance to the south, the defendant is not entitled, as a riparian proprietor, to any land within the limits of plaintiff's locations on the plats, covered by such deposit, except such part thereof, if any, which was dry land beyond the limits of ordinary high tides adjacent to the contiguous land before the grant aforesaid to plaintiff by the State.

4. That if the jury believe that the increase of the land within the limits of the plaintiff's locations on the plats was from the edge of the channel or from the river inland, the defendant is not entitled thereto as alluvion, by reason of her being adjacent riparian proprietor ; nor were her predecessors in title so entitled as such. .     .

5. That there is no sufficient evidence in the cause from which the jury can find that the witness, Hezekiah Linthicum, or any of his successors in title, was or were in possession of the lands located on the plaintiff's claims and pretensions on the plats, so as to bar the plaintiff's title.

6. That if the jury find that the land described in the declaration, is parcel of the lands granted to the plaintiff by the patent offered in evidence, and is truly located on the plats ; and further find that at the date of the special warrant mentioned in said patent, the waters of the Patapsco River, at ordinary high tides, overflowed that part of said land described in the declaration, which lies east of Sweetzer's bridge, as located on the plats ; or that, at the date of said special warrant, the shore of said river east of said Sweetzer's bridge, as located, had in fact, not

been extended from north to south, the distance from the bank thereof shown on the plats to the north lines of the lands patented as aforesaid to the plaintiff and described in the declaration, the plaintiff is entitled to recover all such lands included in his claims and pretensions, as located and mentioned in the declaration, as lies to the east of said Sweetzer's bridge, and the plaintiff is also entitled to recover all such part of the land mentioned in the declaration, and lying west of said Sweetzer's bridge, as located, as the jury shall find was overflowed by the ordinary high tides of the Patapsco River, at the time of the date of the special warrant aforesaid, mentioned in said patent, exclusive of that part thereof covered by the lines of Leicestershire, an older survey as shown on the plats.

7. That the defendant claiming under the operation of the mortgage from Linthicum to Pumphrey, and the deed from Pumphrey to Coan, mentioned in the evidence, the land or any part thereof mentioned in the declaration, is estopped from insisting that the said land or any part of it was alluvion at the date of the mortgage from Linthicum to Pumphrey.

The defendant prayed the Court to instruct the jury as follows :

1. That if the jury shall find that Hezekiah Linthicum, one of the grantors of the defendant, owned the land described in the deed to him from Richard Linthicum, dated August 23rd, 1831, and was seized thereof from the date of said deed, to 11th April, 1856, when he conveyed to his son, and that said son mortgaged the said land to Thos. Pumphrey; that said mortgage being in default, the said land was duly sold, and said Pumphrey became the purchaser thereof; and that said Pumphrey and said Hezekiah uniting, conveyed said land to said defendant, so much thereof as is described in the deed from them to her given in evidence, and that said land so conveyed to defendant then did bind upon and adjoin the River Patapsco,

as shown and described in the plats; and that said land, or so much of it as is described in the *narr.*, and shown upon said plats, is composed wholly of alluvion, formed by gradual accretion in course of formation, prior to and since the plaintiff's application for the patent given in evidence, then the plaintiff cannot recover.

2. That if the jury shall find that prior to 1861, all the land described in the *narr.* was alluvion, formed prior thereto by accretion, from the shore of the land now owned by defendant, and of which land Hezekiah Linthicum had been seized under patent, theretofore duly granted, as stated in the first prayer, then plaintiff cannot recover.

The Court (Fowler, J.,) refused the prayers of the plaintiff, and granted those of the defendant. The plaintiff excepted, and the verdict and judgment being against him, he appealed.

The cause was argued before Alvey, C. J., Miller, Irving, Ritchie, and Bryan, J.

*Julian I. Alexander,* for the appellant.

Before the Act of 1862, ch. 129, the right of soil of owners of land bounded by a navigable river, extended only to high water mark, and the shore below common high tide belonged to the State as trustee for the public; and the State had the absolute proprietary interest in the same, and it might by grant become private property. 3 *Kent Comm.*, 427, *et seq.*, and cases cited; *Hall on the Seashore,* 14, 15–18; *Hale de Jure Maris, XIV, XV; Browne vs. Kennedy,* 5 *H. & J.,* 196; *Giraud's Lessee vs. Hughes, et al.,* 1 *G. & J.,* 249; *Casey's Lessee vs. Inloes,* 1 *Gill,* 430; *Day vs. Day,* 22 *Md.,* 530; *Smith's Lessee vs. Devecmon,* 30 *Md.,* 473; *Patterson vs. Gelston,* 23 *Md.,* 432; *Goodsell vs. Lawson,* 42 *Md.,* 248; *Chapman vs. Hoskins,*

2 *Md. Ch. Dec.*, 489–491; *Stevens vs. Patterson R. R.*, 34 *N. J. L.*, 532.

Upon these authorities, it was competent for the State, before the Act of 1862, to grant the land covered by water in front of a water lot, and by such grant, when the patent once issued, the riparian proprietor was shut out.

For the definition of alluvion, reference may be had to *Hall on the Seashore*, 108, *et seq.* In *Attorney-General vs. Chambers*, 4 *DeG. & J.*, 71, the Lord Chancellor says: "Lord HALE clearly limits the law of gradual accretions to the cases where the boundaries of the seashore and adjoining land are so undistinguishable that it is impossible to discover the slow and gradual changes which are from time to time accruing, and when at the end of a long period it is evident there has been a considerable gain from the shore, *yet the exact amount of it, from the want of some mark of the original boundary line, cannot be determined.* But where the limits are clear and defined, and the exact space between those limits and the new high water line can be clearly shown, although from day to day or even from week to week, the progress of the accretion is not discernible, why should a rule be applied which is grounded upon a reason which has no existence in the particular case."

Now in this case the river bank is distinctly shown, as is admitted, and there is abundant evidence of where the line of high tide was at the time of the grant to plaintiff. The original boundary line of the defendant's predecessor in title, is distinctly shown, and there is proof on the part of the plaintiff that the river, at the date of the plaintiff's patent, ran from bank to bank.

The second prayer of the defendant put it, that if the *locus in quo* was all alluvion before 1861, the plaintiff could not recover. The first prayer must necessarily have been intended to be different from this, and accordingly puts it, that if the *locus in quo* was all alluvion, formed by gradual

accretion, *in course of formation,* prior to 1861 and since 1861, the plaintiff cannot recover. This apparently being grounded on some of the defendant's evidence, "that in the formation of land in the bed of a river, or by accretion, wild oats come first, then flags, then cat-tails, and then three-cornered grass ; that flags will spring up in a marsh covered habitually by six inches of water, and that since 1854, cat-tails were visible everywhere in the river except in the channel," &c., and it being thus concluded that wherever land has thus begun to be formed, it is alluvion, though habitually covered by water, and therefore cannot be the subject of a grant by the State. But it seems to be clear that alluvion is alluvion by its becoming in fact part of the bank of the river, and being thus removed from the line of ordinary high tide. And yet the jury were told, that if the accretions which subsequently constituted the *locus in quo,* were at any time before and after 1861 in course of formation, that made alluvion.

But it was distinctly proved by the plaintiff, that in 1868 there was a great freshet in the river, which filled up the bed of the river powerfully, deflected the channel fifteen or twenty feet from its former course towards the south, and deposited fifteen inches or two feet of mud upon the *locus in quo.* The defendant herself attempted to prove that in 1861 or 1862, a scow was sunk, which deflected the channel towards the Anne Arundel shore, and contributed considerably to fill up the river ; and again, when the causeway was made at Sweetzer's Bridge in 1861, the filling up of the river increased rapidly. Now it is impossible to say that that was imperceptible, which was plainly observed by witnesses. The alleged alluvion was made by the filling up of the river, it is said, but the filling up of the river was observed by the witnesses at several times when it occurred. How then can this land be said to be alluvion ?

But the plaintiff proved that there was a considerable swash between the marsh on the river and the Baltimore

County shore, for a long time after the marsh began to appear in the river, and there is a watercourse west of the bridge, shown on the plats, in which the tide now ebbs and flows. Certainly there can be no accretion beyond these lines. *Attorney-Gen. vs. Boston Wharf Co.,* 12 *Gray,* 553.

The plaintiff's fourth prayer was, that if the land made inland from the edge of the channel, of which there was evidence, the defendant was not entitled. It is clear that if the marsh arose in the river, the plaintiff was entitled to that. The defendant herself proved that the mud was bare and a pathway ran over it near the channel. Hence if the jury believed that the land made in from the channel to the river bank, the *locus in quo* was alluvial to the island at the edge of the channel and not to the bank.

*R. R. Boarman,* and *George Hawkins Williams,* for the appellee.

As compensation for the abrasion or washing away of land, the law gives to the riparian owner all accretion ; it is a common law right, and the riparian owner holds subject to such loss or gain as the case may be ; the Act of 1862, ch. 129, but declares this common law principle.

As this right, when there is a formation of alluvion, prevails against the State, and is acknowledged by it as a part of the public law, the grantee from it can be in no better condition, and he is subjected to what the grantor was, even though the grantor was sovereign ; nor does he take his grant in any ignorance that he is not subordinated to such—the rights of a riparian owner.

Whether alluvion is formed from the channel inward, or from the shore outward, even were such a thing credible, forming inwardly is a matter of no importance. When accretion so formed becomes a part of the shore, riparian ownership of it is perfect; and that to give ownership it should be indistinguishable to the eye whilst so forming, has not heretofore been stated as a necessary ingredient to

riparian rights; the formation of alluvion is the act of God, and whether developed by gradual deflection of a channel, by freshet or otherwise, the land developed was gradually forming, and the ability of the eye to detect this gradual formation under the water, is not also a necessary constituent of rights of ownership.

When the State granted the patent for Leicestershire, and it did bind upon a navigable river, the State granted it with all its common law riparian rights—to which all subsequent grantees of the State are subordinated—and the State cannot, by fresh grant, destroy rights of ownership arising from the binding of land upon navigable water. *Patterson vs. Gelston,* 23 *Md.,* 447; *Giraud's Lessee vs. Hughes, et al.,* 1 *G. & J.,* 263; *Day vs. Day,* 22 *Md.,* 533; *Chapman vs. Hoskins,* 2 *Md. Ch. Dec.,* 494.

BRYAN, J., delivered the opinion of the Court.

In the year 1763, Charles Croxell obtained a patent for a tract of land in Baltimore County, which was called Leicestershire. It was bounded for a considerable distance by the Patapsco River. In the year 1831, the title to a portion of this tract became vested by regular mesne conveyances in Hezekiah Linthicum; and in the year 1856, a portion of Hezekiah Linthicum's portion was duly conveyed to Margaret Coan. This latter portion had the Patapsco River as one of its boundaries. In 1861, Sweetzer Linthicum obtained a patent for a tract of land containing three hundred and seventy-eight acres and three-quarters, named Linthicum's Comet. It was covered entirely by the waters of the Patapsco; and according to its location by course and distance, it was bounded by the lines of Leicestershire where the latter tract bordered on the river; the lines of the two tracts at this boundary, strictly conforming to each other. Along the river-boundary of Margaret Coan's land, and running towards the channel of the Patapsco, a considerable body of land has been formed where

the water formerly flowed. It lies within the lines of Linthicum's Comet, as they are designated in the patent, and is supposed to contain about twenty-eight acres. The questions before us arise in an action of ejectment brought by Sweetzer Linthicum to recover this land from Margaret Coan. The Patapsco at this point is a public navigable river, in which the tide ebbs and flows.

. The evidence for the plaintiff in the Court below tended to prove, that at the date of the patent for Linthicum's Comet, the river at ordinary high tide overflowed all the land in question, and that the portion of it east of Sweetzer's Bridge began to be formed some years after 1860, and the formation of land commenced from the edge of the main channel of the river, and increased in a northerly direction inland towards the Baltimore County shore of the river, and did not make outwards from the fast land on the shore. The evidence on the part of the defendant contradicted this testimony, and tended to prove that the river had been gradually filling up from the bank on the Baltimore County side towards the channel since 1846 or 1848, and that the flats and marsh on the bank of the river in 1854 were nearly in the same condition as they are now, except that at that time they were not so solid as they are now. There was also evidence on the part of the plaintiff that there was a great freshet in the river in or about the year 1868, which filled up the bed of the river very much, and deflected the main channel fifteen or twenty feet from its original course towards the Anne Arundel shore east of the bridge, and made a deposit of from fifteen inches to two feet of mud on the premises described in the declaration.

It is thus seen that we are to determine the respective rights of the riparian proprietor, and of the owner of the bed of the river. In *Giraud's Lessee vs. Hughes, et al.*, 1 *G. & J.*, 249, this Court considered one of the questions arising in this case, and they laid down the law as follows:

Linthicum *vs.* Coan.

"The principle seems to be well settled that where a tract of land lies adjacent or contiguous to a navigable river or water, any increase of soil formed by the waters gradually or imperceptibly receding, or any gain by alluvion in the same manner, shall, as a compensation for what it may lose in other respects, belong to the proprietor of the adjacent or contiguous land." And the Court refers with approbation, to 2 *Blackstone's Commentaries, page* 261, where it is said, "as to land gained from the sea, either by alluvion by the washing up of sand and earth, so as in time to make *terra firma,* or by dereliction, as when the sea shrinks back below the usual water mark, in these cases the law is held to be, that if this gain be by little and little, by small and imperceptible degrees, it shall go to the owner of the land adjoining." The same rule is generally recognized by the authorities, although it is sometimes expressed in language slightly different. In *Rex vs. Yarborough,* 3 *Barn. and Cress.,* 91, the Court of King's Bench decided that the word "imperceptible" in this connexion must be understood as "expressive only of the manner of accretion, and as meaning imperceptible in its progress, and not imperceptible after a long lapse of time." And when this case came before the House of Lords, on writ of error, the judgment below was affirmed. The Lords requested the opinion of the Judges, and the unanimous opinion of all the Judges who heard the argument was delivered by BEST, Chief Justice, and concurred in by the Lord Chancellor and Lord ELDON. The abstract of this opinion states its substance as follows: "Land, not suddenly derelict, but formed by alluvion of the sea, imperceptible in progress, belongs to the owner of the adjoining demesne lands, and not to the crown." 5 *Bingham,* 163. And if we refer to the original authority on which this whole doctrine is founded, it is manifest that these decisions correctly state the meaning of the rule. The earliest exposition of it in any work on the common law is found in the second chapter of the second book of

*Bracton,* who adopts, almost *verbatim,* the language of the civil law as it is found in the *Institute, liber* 2, *title* 1, *section* 20. The words of the text are "*Est autem alluvio latens incrementum; et per alluvionem adjeci dicitur quod ita paulatim adjicitur quod intelligere non possis quo momento temporis adjiciatur."* Alluvion is a secret increase which is so gradually added, that it cannot be known at what moment it is added. It is contradistinguished from those large additions which are made to the land when the sea suddenly recedes, or when it casts up, by its immediate and manifest force, large quantities of earth and sand. The rights of the riparian proprietor do not depend at all upon the question whether the amount of increase can be definitely measured by fixing accurately the original location of the bank of the river. If the increase were not perceptible, after it had accrued, it would hardly be necessary that the title to it should be determined by the law. In *Lord Yarborough's Case* the land formed by accretion amounted to four hundred and fifty acres; and in the noted case of the City of New Orleans against the United States the accretions embraced the whole river front of the city, and were of immense value. There is an annual rise in the Mississippi River, which continues for several months. When the waters subside they leave in some places large deposits of mud, which, in the course of successive accumulations, reach the height of the banks of the river and become firm land. The land in this way is *gradually* formed, inasmuch as it is the result of causes continually in operation through a considerable period. But the deposits are frequently very large. It is said that on one occasion, after the fall of the waters, the *batture* was extended into the river a space measuring from seventy-five to eighty feet, and was covered with mud to a depth varying from two to seven feet. In dealing with this case the Supreme Court discard altogether the use of the word "*imperceptible.*" They say "the question is well settled at common law, that the person whose land is bounded by a

stream of water, which changes its course gradually by alluvial formations, shall still hold by the same boundary, including the accumulated soil. No other rule can be applied on just principles. Every proprietor whose land is thus bounded is subject to loss by the same means which may add to his territory; and as he is without remedy for his loss in this way, he cannot be held accountable for his gain." 10 *Peters,* 717. The Court evidently considered that the justice and true sense of the rule depended on the question, whether the land was formed by the operation of causes extending through a length of time, without any reference to the consideration whether the stages of the progress towards the final result could be perceived.

It has been made a question in this case whether the patent for Linthicum's Comet did not take away from the riparian owners the right to such accretions as we have been considering. As it was issued before the passage of the Act of 1862, chapter 129, it is of course not affected by this statute. If the land covered by the patent had remained the property of the State, the riparian owners would have been entitled to the accretions under the circumstances above mentioned. It was a valuable right given to them by the law. It is needless to consider in the present case, whether the Legislature could have divested this right by changing the law. It is very certain that no other department of the State Government has the power to do so. When the Commissioner of the Land Office issued a patent to Sweetzer Linthicum, he merely sold him the State's interest in the land. He could not thereby diminish or abridge the rights of the riparian owners. The patent is simply a grant of land, and this grant is made subject to all existing rights. The rights of the riparian owners connected with this land were valuable and essential parts of their own estate, and they could not on any principle of law or reason be deprived of them, merely by the act of the State in parting with its ownership. We are not called upon in this connexion

to consider any theory of the sovereign rights of the State. These sovereign rights must be exercised in the mode and by the agencies prescribed by the Constitution. The only right of the State exerted by the Land Office when this patent was issued, was to sell the land, and to receive the money for it. When it is proposed to take away from the adjacent proprietors the rights in land covered by navigable waters which the law has conferred upon them, the question must be dealt with by that department of the government, which alone has the power to change the law. It is sufficient for the present purpose to say that no statute has been enacted, which purports to abridge the rights of the riparian proprietors as they were established by the common law. An expression to be found in the report of the case of *Goodsell vs. Lawson*, 42 *Md.*, 364, militates with the conclusions which we have reached. It is in the opinion of the learned Judges of the Circuit Court for Somerset County. Speaking of the Act of 1862, they say: "Previously, a person's right to the accretion or even to make improvements under laws then existing, might be practically destroyed by a grant from the State for the land covered by the water adjacent to his premises." The decree of the Circuit Court was affirmed by the Court of Appeals. The controversy in the case related entirely to improvements made under the Act of 1862, and did not involve in any way the right of accretion. Nor does the opinion of this Court make any reference to this right. It has been decided in *Giraud's Lessee vs. Hughes*, 1 *G. & J.*, 249, and in *Casey's Lessee vs. Inloes*, 1 *Gill*, 430, that the right to make improvements in navigable waters granted by the Act of 1745, chapter 9, section 10, was a mere privilege of acquiring property by reclaiming it from the water, and that until the improvement was completed, no title was acquired by the adjacent owner. And as a consequence of this doctrine, it was held in *Casey and Inloes*, that where a riparian proprietor had not made any improvements in front of his property,

his right to make them was intercepted by a grant from the State of land covered by navigable water bounding his property. The Circuit Court, in discussing the right to make improvements, inadvertently included in their remarks the right of accretion which was founded on different reasons.

If the land in question was formed by gradual accessions extending from the shore into the river, it would belong to the riparian proprietor; and this would be the case notwithstanding the fact, that by the influence of floods and freshets, large deposits of mud may have been made in the bed of the river. These deposits would, of course, materially contribute to the formation of land, and would hasten the time when it would appear above the surface of the water. But the leading characteristic of alluvion is the gradual extension of the land from the shore into the water; and when this is the case, it is irrelevant to consider the causes which, operating beneath the surface of the stream, have brought about the result. On the other hand, if land was formed in the river, and extended inwards towards the shore, it would be the property of the plaintiff, with all its accretions. Under these circumstances, it would have belonged to the State, if the patent had not been issued; and the plaintiff has of course, acquired the State's title. If the plaintiff's fourth prayer had distinctly left this question to the jury, it ought to have been granted; but it is not clear to us that this was its meaning—There is considerable obscurity in its terms, and it would have perplexed the jury. The plaintiff's seventh prayer was properly refused. The alluvion was part and parcel of the land bordering on the shore, and would pass to a grantee without express mention.

We agree with the Circuit Court in all its rulings.

*Judgment affirmed.*

(Decided 26th January, 1886.)