VAN RUYMBEKE ET AL. *v.* PATAPSCO
INDUSTRIAL PARK ET AL.

[No. 326, September Term, 1970.]

*Decided April 13, 1971.*

The cause was argued before HAMMOND, C. J., and FINAN, SINGLEY, SMITH and DIGGES, JJ.

*David F. Albright* and *Albin M. Plant,* with whom were *Daniel C. Joseph, Bradley T. J. Mettee* and *Thomas A. Garland* on the brief, for appellants.

*Wallace Dann,* with whom were *Bregel & Bregel, Chartered,* on the brief, for appellees.

SMITH, J., delivered the opinion of the Court.

Since this case involves a suit in ejectment and a patent for submerged lands, it is a relatively "rare bird" in present day judicial proceedings. It also involves claims

relative to accretion and an argument as to what is proper evidence to establish mesne profits, with the added spice of a contention that the case is now moot because of a settlement between certain of the parties subsequent to judgment. Appellants, Eugene Douglas Dudley Kenneth Van Ruymbeke *et al.* (the Van Ruymbekes), were plaintiffs. They are unhappy with the result of the trial in the Circuit Court for Baltimore County, despite the fact that they there prevailed. Since we perceive no errors in the rulings of the trial judge, we shall affirm the judgment.

Although the case here was sufficiently complicated to require 27 days of trial before a jury, for the purposes of our decision the facts can be relatively succinctly summarized. The Van Ruymbekes claim under a deed in 1895 to their ancestor, Joseph Van Ruymbeke. The area in question is partly in Baltimore City and partly in Baltimore County, on the west side of the main stream of the Patapsco River in close proximity to Patapsco Avenue and the Curtis Bay branch of the B. & O. Railroad. Examination of the attached sketch, which the reporter is directed to reproduce, may contribute to a somewhat better understanding of the case. The land lies between the patent of Linthicum's Comet and the original lines of the Van Ruymbeke land except for 1.1632 acres within the original Van Ruymbeke tract. The disputed land not within the original tract was at one time a cove in the Patapsco. It is even conceivable that part of it at one time might have been called "wetlands", a now common term. It therefore stands as a mark that "wetlands" may disappear in areas other than Worcester County.[1] The main question became whether the accretion belonged to the Van Ruymbeke tract or to Linthicum's Comet, a part of which is now owned by one of the defendant-appellees, Patapsco Industrial Park (Patapsco).

The Van Ruymbekes sued (some originally and some by subsequent amendment) Patapsco, MacLeod Construc-

---

1. *See,* for instance, Kerpelman v. Board of Public Works, 261 Md. 436, 276 A. 2d 56 (1971).

tion Company, Inc. (MacLeod), Canary Island Development Co., Inc. (Canary Island), and what we shall later refer to as the Tyler interests, Refuse Disposal, Inc., Waste Disposal, Inc., and Robb Tyler, Inc. The original declaration claimed damages of $200,000.00, an amount raised by subsequent amendment to $600,000.00. The declaration alleged that the deed contained two adjoining tracts, "one containing 40.97 acres and the other containing 11.75 acres, both binding on the waters of the Patapsco River as said river then existed". It claimed that "the said waters of the Patapsco River hav[e] since receded, leaving an area of land containing 15.8055 acres more or less accreted to the land acquired by said Deed * * *." It asserted that the plaintiffs from the date of that deed had been "in rightful, peaceful and continuous possession of said land conveyed by said Deed and accreted to it until the Defendants ejected the Plaintiffs therefrom as to the portion accreted and 1.1632 acres of the original conveyance * * *." It is conceded that the disputed land has been filled by various of the defendants. The only relevant plea of defendants Patapsco, MacLeod, and Canary Island was that of not guilty. The pleas of the Tyler interests basically raised the issue of title.

The case was submitted to the jury on issues. By the first issue it was directed to determine whether the entire area was covered by water, the entire area was not covered by water, or part of the area was covered by water and part not so covered. It determined that the entire area was not covered by water. The second issue directed it to determine from what direction the fast land extended, from the Van Ruymbeke shoreline only, the Linthicum's Comet shoreline only, or from the shorelines of both. It concluded the answer to that question was from the shorelines of both. Pursuant to the court's direction, it then drew dotted lines upon a map showing "the maximum advancement of fast land from both Van Ruymbeke and Linthicum's Comet". By stipulation of counsel, judgment was entered in favor of the Van Ruymbekes against the defendants Robb Tyler, Inc., and MacLeod for the

1.1632 acres within the original Van Ruymbeke conveyance together with damages of $342.63. Upon the jury's verdict, judgment was entered in favor of the Van Ruymbekes against Patapsco, Canary Island, and Waste Disposal, Inc., for certain of the land which had accreted within the cove adjacent to the Van Ruymbeke land. The jury determined the damages relative to that land to be in the amount of $2,741.00. By stipulation, $2,055.75 of this was entered as a judgment against Patapsco, Canary Island, and Waste Disposal, Inc., with the remaining $685.25 as a judgment against Patapsco only, apparently, as indicated in the brief of appellees, on the basis of an apportionment resulting from the fact that Patapsco was the only defendant in possession of the premises from January 19, 1967, until the date of the verdict. The appellees here are Patapsco and Canary Island. Subsequent to the Baltimore County Circuit Court decision a settlement was reached between the Van Ruymbekes and the Tyler interests represented by Refuse Disposal, Inc., *et al.*, as a result of which a stipulation was filed that the appeals of those parties be dismissed, that the judgment entered against Robb Tyler, Inc., "be entered as paid and satisfied", and that the judgment "in the amount of $2,055.75 against Patapsco Industrial Park, Canary Island Development Company and Waste Disposal, Inc., be released as against Waste Disposal, Inc., only." Patapsco and Canary Island claim this action makes this case moot. Since we find no error on the part of the trial judge, we are not obliged to pass upon this point.

I

Linthicum's Comet is the same land which was before our predecessors in *Linthicum v. Coan,* 64 Md. 439, 2 A. 826 (1886). It was a patent to underwater land issued in 1861, prior to the enactment of Chapter 129 of the Acts of 1862 prohibiting under water patents (now Code (1968 Repl. Vol.) Art. 54, § 48).

Under Maryland Rule T42 b the plea of not guilty put in issue title to the land. The Van Ruymbekes would not

be entitled to recover if the various defendants established an outstanding title "with clearness and precision * * * a title of such nature as to entitle [a] stranger to recover in ejectment against either of the contending parties." *Lannay v. Wilson*, 30 Md. 536, 546 (1869), and *Hall v. Gittings*, 2 H. & J. 112, 125 (1807). The Van Ruymbekes complain that the trial judge erred in even permitting the jury to decide whether any of the disputed land which the jury determined was not covered by water had accreted to Linthicum's Comet. As they see it, the Linthicum's Comet patent was an infringement upon their riparian rights. Accordingly, they conclude that any accretion between Linthicum's Comet and their land must all become their land, and, therefore, the title to none of the accreted land would pass to Linthicum's Comet. In other words, their theory is that title to accreted land in this instance could be *only* from the shore outward, that there could be no title by accretion from the island inward.

The Patapsco River here admittedly was navigable. In Maryland navigable water is defined as where the tide ebbs and flows. *Wagner v. City of Baltimore*, 210 Md. 615, 124 A. 2d 815 (1956); *Toy v. Atlantic Etc. Co.*, 176 Md. 197, 4 A. 2d 757 (1939); *Linthicum v. Shipley*, 140 Md. 96, 116 A. 871 (1922); *Sollers v. Sollers*, 77 Md. 148, 26 A. 188 (1893); and *Hess v. Muir*, 65 Md. 586, 5 A. 540, 6 A. 673 (1886). It is not necessary to a stream's being navigable in fact that it be capable of carrying large vessels. *Toy v. Atlantic Etc. Co.*, and *Gray v. Gray*, 178 Md. 566, 16 A. 2d 166 (1940). The property owner owns to the mean high water mark. There was no contention here relative to whether the federal navigable-in-fact test was applicable. *See* footnote in *Owen v. Hubbard*, 260 Md. 146, 152, 271 A. 2d 672 (1970), and cases there cited.

McHenry notes in the introduction to his work, *Ejectment Law of Maryland* (1822):

"In the year 1632, Maryland as a Province,

was granted by Charles the first, King of England, to Lord Baltimore, by Charter constituting him absolute Lord and Proprietary of the Province of Maryland, with power to him, his heirs and assigns to grant any part of the Province, in fee simple, fee tail or otherwise, to be held of the Lord Proprietary, his heirs and assigns." *Id.* at 25.

In *Bowie v. Western Md. R. R. Ter. Co.*, 133 Md. 1, 104 A. 461 (1918), Chief Judge Boyd referred to *Browne v. Kennedy*, 5 H. & J. 195 (1821), and said:

"Whatever the law was elsewhere that case settled it for this State, and has never been overruled or qualified. It was there held that Lord Baltimore, [as] proprietor of Maryland, acquired the same right to dispose of land covered by navigable waters within the Province, under the charter granted to him by the King, as the King had prior to granting the charter—subject to the right of the public to use it for fishing and navigation. The right to grant land covered by navigable waters afterwards became vested in the State—subject to the same restrictions." *Id.* at 7.

There is authority in Maryland for the rejection of an underwater patent. In *Day v. Day*, 22 Md. 530 (1865), there was an application for a patent prior to 1862. The land was underwater. Before the passage of the Act of 1862 the Commissioner of the Land Office granted the patent, overruling the caveat. The appeal reached our predecessors after the passage of the 1862 act. The Court said:

"The Common Law distinction between navigable waters, and rivers or streams not navigable, is founded on the difference of the rights to which they are respectively subject; the entire property of the former being vested in the

public, while the latter belong to riparian proprietors, although in some cases subject to a qualified public use. Rivers or streams within the ebb and flow of tide, to high water mark, belong to the public, and in that sense are navigable waters; all the land below high water mark, being as much a part of the *jus publicum,* as the stream itself. The owners of adjacent ground had no exclusive right to such lands, nor could any exclusive right to their use be acquired, otherwise than by an express grant from the State. The Act of 1862 was intended to vest these owners of contiguous lands with rights and privileges not recognized by the Common Law, and to that end, the 1st section declares,—that the proprietor of land bounding on any of the navigable waters of the State, should be entitled to all accretions thereto by the recession of water, whether before or thereafter formed or made, by natural causes or otherwise." *Id.* at 537.

The Court went on to hold that the patent should not issue. In *Patterson v. Gelston,* 23 Md. 432 (1865), after first citing *Day,* the Court said:

"Upon the principles decided by the late Chancellor, in *Chapman v. Hoskins,* 2 Md. Ch. 485 [(1851)], to which we give our entire approbation, no patent ought to be granted for land so situated, even though the power of the State to grant such patent might be unquestionable, and the Act of 1861-1862 had not been passed." *Id.* at 448.

In *Baltimore & O.R.R. v. Chase,* 43 Md. 23 (1875), there was a conflict between riparian owners. Both grants had come from the State as a result of what were termed the "Confiscation Acts" of 1780 and 1781, the "property [having] belong[ed] to British subjects, and which es-

tate, with certain exceptions and reservations, was divided into lots and sold by commissioners appointed by the State." The rights of riparian owners were summed up by Judge (later Chief Judge) Alvey:

"By the common law it is well settled, that where land lies adjacent or contiguous to a navigable river, in which there is an ebb and flow of the tide, any increase of soil formed by the *gradual and imperceptible recession* of the waters, or any gain by the *gradual and imperceptible formation* of what is called alluvion, from the action of the water in washing it against the fast land of the shore, and there becoming fixed as part of the land itself, shall belong to the proprietor of the adjacent or contiguous land. 2 Bl. Com. 261; *Giraud v. Hughes*, 1 G. & J. 249 [(1829)]. And the right to accretion, thus formed, is considered as an interest appurtenant to the principal land, and belonging, in the nature of an incident, to the ownership of that, rather than as something acquired by prescription or possession, in the ordinary legal sense of those terms. 3 Washb. on Real Prop. 59. And in addition to this right by reliction or accretion, the riparian proprietor, whose land is bounded by a navigable river, whether his title extends beyond the dry land or not, has the right of access to the navigable part of the river from the front of his lot, and the right to make a landing, wharf or pier for his own use, or for the use of the public, subject to such general rules and regulations as the Legislature may think proper to prescribe for the protection of the rights of the public, whatever those rights may be. This is well established doctrine by both Federal and State courts. *Dutton v. Strong*, 1 Bláck, 25; *R. R. Co. v. Schurmeir*, 7 Wall. 272; *Yates v. Milwaukee*, 10 Wall. 497; *East Haven v. Heming-*

*way,* 7 Conn. 186; *Sherlock v. Bainbridge,* 41 Ind. 35.

"These riparian rights, founded on the common law, are property, and are valuable, and while they must be enjoyed in due subjection to the rights of the public, they cannot be arbitrarily or capriciously destroyed or impaired. They are rights of which, when once vested, the owner can only be deprived in accordance with the law of the land, and, if necessary that they be taken for public use, upon due compensation. *Yates v. Milwaukee,* 10 Wall. 504. It is in view of these principles that the present action is sought to be maintained. But these principles of the common law, governing the rights of the riparian owner, however well established, are subject to change and modification by the statute law of the State, and by the nature and circumstances of the grant by which the title may have been acquired to the land bounding on the river." *Id.* at 34-36 (Emphasis in original).

The holding of that case was that the State, having granted one lot with consequent riparian rights, could not by a subsequent grant of another lot cut off those riparian rights.

Patapsco sees help here in the case of *Melvin v. Schlessinger,* 138 Md. 337, 113 A. 875 (1921). The dispute there concerned land patented subsequent to the act of 1862. The Court distinguished *Linthicum v. Coan,* held that the patent should not have been issued, and that good title did not exist in the patentee, stating:

"The Act was passed with the intention and for the purpose of enlarging the rights of riparian owners upon navigable waters of this State by giving to them accretions to their lands, to which, without the statute, they would not be entitled, and also by giving to them the exclusive right to make improvements in the waters in

front of their lands; and while it has been said that it was not intended by the Act to give to such riparian owners the title to the bed of the stream (*Goodsell v. Lawson* [,42 Md. 348 (1875)]) ; yet by the language of the Act, we do not think the accretions contemplated by it, to which the riparian owners are thereby entitled, are confined to those only that, in their formation, start at the shore and extend outwards to the channel.

"As already stated, the riparian owners had the right to such accretions before the passage of the Act when they were imperceptibly formed, and now to say that their rights, enlarged by the statute, go only to the extent of adding thereto accretions which have been more rapidly and suddenly formed, from natural causes or otherwise, extending outward from the shore, would be giving the statute a very narrow construction and one that, we think, should not be adopted.

"The Act prohibits the granting of patents that will impair or affect such rights of the riparian owners * * *." *Id.* at 343.

In *Browne v. Kennedy*, 5 H. & J. 195 (1821), Judge Buchanan said for the Court:

"If one has an estate, through which a private river runs and an island should arise in the river, it will belong to him; so, if he has the property in the soil of a public river, and an island springs up, it will equally belong to him. Again, if in the case of a private river, the bed is left bare by a sudden recess of the water, the relicted land remains the property of the former owner; and so, if one had the property in the soil of a public river, and the bed is left bare by a sudden recess of the water, the relicted land will remain his; because in each case the prop-

erty in the soil is in him. And for the same reason all islands, relicted land, and other increase arising in navigable rivers, belong, in England, to the King, here to the State, where the property in the soil has not been appropriated; but where it has become private property, either by grant or prescription, the same rules do or should apply to it that govern other private property of the same nature." *Id.* at 206.

We regard this case as controlled by *Linthicum v. Coan, supra.* In that case Linthicum, the plaintiff, was the owner of Linthicum's Comet. He requested an instruction (refused by the trial court) as follows:

"4. That if the jury believe that the increase of the land within the limits of the plaintiff's locations on the plats was from the edge of the channel or from the river inland, the defendant is not entitled thereto as alluvion, by reason of her being adjacent riparian proprietor; nor were her predecessors in title so entitled as such." *Id.* at 442.

In discussing this and other points our predecessors there said:

"If the land in question was formed by gradual accessions extending from the shore into the river, it would belong to the riparian proprietor; and this would be the case notwithstanding the fact, that by the influence of floods and freshets, large deposits of mud may have been made in the bed of the river. These deposits would, of course, materially contribute to the formation of land, and would hasten the time when it would appear above the surface of the water. But the leading characteristic of alluvion is the gradual extension of the land from the shore into the water; and when this is the case, it is irrelevant to consider the causes which,

operating beneath the surface of the stream, have brought about the result. On the other hand, if land was formed in the river, and extended inwards towards the shore, it would be the property of the plaintiff, with all its accretions. *Under these circumstances, it would have belonged to the State, if the patent had not been issued; and the plaintiff has of course, acquired the State's title.* If the plaintiff's fourth prayer had distinctly left this question to the jury, it ought to have been granted; but it is not clear to us that this was its meaning—There is considerable obscurity in its terms, and it would have perplexed the jury." *Id.* at 454 (Emphasis added).

The Van Ruymbekes claim the trial judge "permitted the jury to decide that a part of the increase of the land went from the river inland. This instruction was expressly *refused* in *Linthicum v. Coan!*" (Emphasis theirs).

The trial judge here said to the jury in pertinent part:

"You are instructed as a matter of law that the owners of the Van Ruymbeke property and the owners of the northern lines of Linthicum's Comet are riparian owners.

"Under the law, riparian owners would gain such fast land, if any, that attaches to their holdings by accretion, would lose such fast land, if any, that detaches from their holdings by erosion.

"Accretion means a gradual or imperceptible building up of the land underwater until it is no longer covered by the ebb and flow of tide to the high water mark. It may occur from the deposition of materials by the river itself or from the deposition of materials by drainage courses entering the river from other fast land or both. When and if fast land emerges to connect to existing fast land, it becomes, by opera-

tion of law, the property of the riparian owner of such existing fast land to the point of its maximum advancement even if that maximum advancement continues until it meets the fast land of another riparian owner.

"Fast land by accretion is defined as that land lying above the high water mark that has become affixed to other fast land belonging to a riparian owner.

"A marsh is fast land if you find that it is not subject to being covered by the ebb and flow of tide, that is, if it is above the high water mark. On the other hand, a marsh is not fast land if it is covered by the ebb and flow of tide, that is, if it lies below the high water mark.

"High water mark is defined as that highest elevation of water in the course of the usual, regular, periodical ebb and flow of the tide excluding the advance of waters above that line by winds and storms or by freshets and floods."

That charge met the objections of our predecessors in *Linthicum*.

There was no contention here as in *Melvin v. Schlessinger, Chapman v. Hoskins, Patterson v. Gelston* and *Day v. Day*, all *supra*, as to the invalidity of the patent to Linthicum's Comet, nor are we convinced that at the time of the issuance of the patent it should have been foreseen that many, many years later the river would so change that there would be no water between the Van Ruymbeke land and Linthicum's Comet. Therefore, we come down to what Chief Judge Brune said for the Court in *Wagner v. City of Baltimore*, 210 Md. 615, 124 A. 2d 815 (1956) :

"Prior to the Act of 1862 the rights of the abutting landowners depended upon whether the land was built up by growth outward from the shore or by extension inward from an island formed in the water. *Linthicum v. Coan*, 64 Md.

439, 2 A. 826. Under the statute, it makes no difference. *Melvin v. Schlessinger, supra." Id.* at 626.

Since the patent for Linthicum's Comet was issued prior to the Act of 1862, there was no error on the part of the trial judge.

## II

Under Maryland Rule T43, a verdict having been entered in the ejectment action in favor of the Van Ruymbekes, they are entitled to "Damages, including mesne profits." As they frame the issue:

"The court below erred (i) in refusing to permit the Van Ruymbekes to introduce evidence concerning the profits made from the sanitary landfill operations conducted upon the Van Ruymbekes' land and (ii) in submitting to the jury the question of the amount of damages, if any, to which the Van Ruymbekes were entitled under instructions which permitted the jury to consider only the rental value of the eight acres awarded to the Van Ruymbekes."

At the outset it should be made plain that in this case we have no claim for waste. We have no claim that the action of the defendants in any way diminished the value of the land. Counsel for the Van Ruymbekes told the trial judge, "I do not intend to prove diminution in market value as a money figure, but the effect of the fill on the land as a factor to be considered in rental value is something which I intend to prove."

At no time do the Van Ruymbekes point precisely to the proffer of testimony which the trial judge rejected. From the Patapsco brief we glean that this testimony was summed up in the court's rulings on the motion. It would have been of substantial assistance to this Court and in keeping with the rules had the matter been set forth with more precision and particularity. Judge Menchine's comments were as follows:

"(The Court) All right, the Court will refuse the proffer, will assume for the purpose of the proffer that the witness, if called, would so testify as counsel has indicated, that the figures as given represent the true figures of profit for the purpose of the proffer, and that there was, indeed, a total profit by the Waste Disposal Company of the figure of five hundred and forty-two thousand seven hundred sixty-nine dollars and thirty-five cents that was earned during the course of the years between 1961 and 1968; that that profit was achieved by the receipt upon the property in this area, consisting of the 9.9-acre tract, the twenty-nine-acre tract and the 3.771-acre tract.

"The Court assumes, for the purpose of the proffer, also, that if it were necessary to make a segregation with respect to time as to the effect of any one year or part of years upon this figure, that this could, by the evidence, be achieved by the witnesses offered by the plaintiffs.

"Making all of the assumption that the Court has just declared, the Court is persuaded that the evidence is inadmissible because, in the view of this Court, the term mesne profits that is used by the cases in Maryland do not include or incorporate within themselves figures of profit even under circumstances where the entry of the defendant was deliberate, intentional and in bad faith. The reason for the Court's action, I think, should be declared. The Court recognizes that the profit of a business, in many instances, may be a true test of damages in litigation of a tortious nature. The Court is mindful that, indeed, profits in an ejectment case such as this may, under some circumstances, be such as to create or cause profit, business profits to be a factor in the determination of damages for a

wrongful invasion and continued possession of land such as would give rise to an ejectment action. The Court believes quite strongly, however, that this is not such a case. Beyond the simple illustration of a difference between the profits that would be and the profit in this case that is not, the Court will cite simply the example of the distinction that the Court's mind gives consideration to in an ejectment case. If there was an ejectment and disseizing by a defendant of a plaintiff who was actually engaged in business himself that would be profitable in the past, evidence from such a plaintiff to show that he was prohibited from continuing to make that profit, would, in the mind of this Court, bring the cause, even though in ejectment, within the rule that profits were a true measure of damage of loss. Such is not this case.

"The Court would also rule that where the land itself was productive of gain to a disseizing defendant, that is to say, if the land itself yielded minerals or produced crops that provided a profit to a tortious defendant, ejector of the true owner of the property, again, profit in such a case, in the view of the Court, well might reflect a proper element for damages in an ejectment case. This case is not such a case. The effort here to suggest that the profits of Waste Disposal based on the formula that the proffer indicates does not, in the view of the Court, constitute any ground or basis for a determination by the jury of profits.

"As a guide to it in fixing the damages that properly are allowable to this property owner, the Court believes that this is the case here for the following reasons: The profits of Waste Disposal are so interrelated with the ownership of equipment and with management, interconnection with the separate supplier of the trash

dumped upon property leased by Waste and so dependent upon that supplier and so interconnected with that supplier by management skill, management connections, with a particular supplier of intertwined ownership, in turn, with such obvious connections by the latter with commercial and industrial firms, which are matters of personal management and general business skill, that bears no relationship whatsoever to the specific use of this property for the conduct of its business, that there is no relationship whatsoever of the profits earned by this corporation that can, with any reason, be suggested to arise by reason of the use and occupation of this particular tract of land.

"For those reasons, the proffer of the plaintiffs with respect to the business profits of Waste Disposal will be denied, and the objection of counsel for the defendants to the testimony of the witness as described in the proffer for purposes therein described will be sustained.

\* \* \*

"(The Court) Right. I think that the best way to say it, for clarity of expression, is that this Court is absolutely convinced that in this case business profits bear no relationship whatsoever to the legal expression, mesne profits, as applied in the cases in Maryland.

"(Mr. Garland) Yes, sir. And the second point on which we claim that the profits would be admissible, would be to show rental value to form a basis of computation for rental value of this land, and this would be tied in with our concept of the importance of the land, the location and other factors contributing to rental value.

"(The Court) Well, the Court, also, believes that it bears no relationship to that point, either."

*Newell on Ejectment* 606 (1892) states:

"*Mesne Profits—The Term Defined.* — Mesne profits are the rents and profits, or the value of the use and occupation of the real property recovered in an action of ejectment during the period the property has been wrongfully withheld. These profits consist of the net rents which the owner might, with reasonable diligence, derive, after deducting all necessary repairs and taxes. It has the same meaning in law as the phrase 'The value of the rents and profits.' "

*See also McHenry on Ejectment* 263-64 (1822) ; 3 *Sedgwick on Damages* § 906 (9th ed. 1912) ; and 4 *Sutherland on Damages* § 993 (4th ed. Berryman 1916).

A claim in an ejectment action for damages or mesne profits did not come into our procedure until the enactment of Chapter 346 of the Acts of 1872, codified in Code (1957) Art. 75, § 25 until its repeal by Chapter 36 of the Acts of 1962. Prior to that act the damages sustained by the eviction of the landowner in the detention of the land from him were recoverable only in a subsequent action of trespass for mesne profits. This being consequential upon recovery in ejectment, the action could not validly be brought before such recovery and if the plea of limitations were interposed by the defendant, damages for only the three years preceding the suit could be recovered. 1 Poe, *Pleading and Practice* § 273 (Tiffany ed. 1925) and 2 Poe, *op. cit.* § 480. The term "mesne profits" was before our predecessors, however, many times prior to 1872.

In *West v. Hughes*, 1 H. & J. 574 (1805), in a case in the General Court,[2] Chief Judge Chase said:

"This is an action to recover *mesne profits*, and the plaintiff must shew, the best way he can, what those profits are. There are two modes of

2. *See* the address by the Honorable E. Dale Adkins, Jr., entitled "Early Courts of General Jurisdiction on the Eastern Shore", 60 Transactions Maryland State Bar Association 182 (1955).

doing so — one of which he may resort to — either prove the profits received from the land, or the probable value of the land. The plaintiff here has resorted to the former mode. Although the recovery in the action of ejectment was for the whole land, the plaintiff must prove possession anterior to the demise in the ejectment, and that the defendant received the profits.

"The defendant may shew that the plaintiff was in possession of part of the land, and received the profits of the part of which he was possessed.

"Suppose a man had been in possession of land of which he had derived no benefit, he could not be compelled to pay more than the profits derived from it, if the plaintiff resorts to that mode of proving the profits. It is not like an action of trespass for damages. It is for the use and occupation of land which was recovered in an action of ejectment.

"It would be an extraordinary thing if the plaintiff could recover profits for lands he himself was in the possession of at the time, and received the profits.

"It appears that there are several tenants on the land. The plaintiff can only recover the profits according to the possession of each tenant, in an action brought against them." *Id.* at 576-77.

In *Mitchell v. Mitchell,* 10 Md. 234 (1856), the plaintiff to show the annual profits of the land offered to prove by the person who lived upon an adjoining farm the amount of net profits which his farm yielded. The Court rejected this contention, saying:

"This testimony, a majority of the court are of opinion, was properly refused for the reason assigned, upon an analogous point, by this court, in *Keedy v. Newcomer,* 1 Md. 251 [(1851)],

> namely, 'that it is no very unusual thing, that thriving and industrious farmers find themselves neighbors to those who are not so distinguished for those qualities,' and hence what one man might make upon his farm, would be no criterion as to what his neighbor has made, even conceding the quantity and quality of the land of each to be equal, which is by no means universally true." *Id.* at 241.

It is important to bear in mind that in the agrarian society of our predecessors cash rent for farm land was practically, if not completely, unknown. In many parts of the state cash rent for farm land has come into being only within the last 25-40 years. Rent — and therefore profits for the landlord—meant a percentage of the proceeds of a given crop.

In *McLaughlin v. Barnum,* 31 Md. 425 (1869), which was not an ejectment action, but rather one for an accounting of rents and profits where there was a sale in lieu of partition, the Court said:

> "There is no satisfactory foundation for the claim to an account of the *profits* realized by McLaughlin and the other occupants from the business of *hotel keeping,* which they carried on in the premises. In cases of express trusts, or where a party voluntarily assumes the management of a trust estate, and converts the property, and uses the proceeds, or the trust funds, consisting of money in hand, or collected from the rents of the trust property if realty, for his own purposes in trade or speculation, or invests them in lands or otherwise, so as to derive profit therefrom, the right of the *cestui que trust* to follow the funds in the new form of investment, and to an account of the actual profits thence resulting, or if this is withheld, to charge the trustee with interest and compound interest on the money so misapplied, may arise. But

what application have authorities sustaining these doctrines to the present case? There is here no express trust, nor did these occupants voluntarily assume the collection and application of the rents of a trust estate, nor did they, by their occupation and use of these premises for this particular business, place themselves in such relation to the complainants as to make applicable between them the rules and principles of equity, regulating the rights and duties of trustee and *cestue que trust*. The position of these parties is simply this: The complainants were merely part owners with McLaughlin, of the *grounds* and *buildings* which he and others have occupied. The latter with their own personal property, servants, capital, skill and labor carried on therein the business of hotel keeping (and the case would not be different if they had in the same way carried on the business of bankers or merchants), without paying the complainants as proprietors and landlords, their share of *the rent* of the premises. It cannot be said the rent which they thus failed to pay was thereby invested in and became part of the *capital* with which this business was conducted or made the complainants *partners* therein.

"Where there is occupation of a farm or land used only for agricultural purposes, and the income and profits are of necessity the produce of the soil, the owner may have an account of the proceeds of the crops or other products actually sold or raised thereon, deducting the expense of cultivation. There are necessarily rents and profits in such cases, but even there, it is more usual to arrive at the same result, by charging the occupier, as tenant, with a fair annual money-rent. But the proprietor of city lots, with improvements thereon, can only derive therefrom as owner, a fair occupation-rent for the

purposes for which the premises are adapted. This constitutes the rents and profits in the legal sense of the terms of such property, and is all the owner can justly claim in this shape from the occupier. The accounting for rents and profits must therefore be upon the basis of a reasonable annual occupation-rent of the premises decreed to be sold." *Id.* at 451-52 (emphasis in original).

In *Worthington v. Hiss,* 70 Md. 172, 16 A. 534, 17 A. 1026 (1889), our predecessors said:

"In our opinion, the court below has gone as far as reason or justice will permit in holding that the true rental value to be considered as the basis of compensation in this respect, is such rental value or occupation rent as might fairly have been made by the defendants during the time of the ouster, by a valid lease of the property in its unimproved condition from year to year or for a term equal to the period of ouster. This, in our opinion, is a liberal application of the general rule governing actions for *mesne* profits * * *." *Id.* at 187.

The Van Ruymbekes set great store by *Capital Garage Co. v. Powell,* 98 Vt. 303, 127 A. 375 (1925), as authority for their contention. That was a tort action supplemental to an ejectment suit between the same parties and was brought to recover the damages occasioned by the plaintiff's being deprived of the use and occupation of the garage in question for approximately 11 months. There was an attempt to establish the profits during that period by the person who carried on the business. In permitting proof of what the occupant had earned as profits in that period, the court said:

"Compensation being the basis of the recovery in these actions, the wrongdoer must respond for gains prevented as well as for losses sus-

tained, so far as the same are sufficiently alleged and proved. The question involved is not so much the right to recover these, as the sufficiency of the proof. *The profits claimed must not be uncertain, speculative, or remote.* But such as the proof reasonably shows that the plaintiff has been proximately deprived of by the defendant's wrongful act are recoverable." *Id.* at 309 (Emphasis added).

In the subsequent Vermont case of *Sabourin v. Woish,* 117 Vt. 94, 85 A. 2d 493 (1952), also cited by the Van Ruymbekes, the court said:

"Mesne profits at common law were the pecuniary gains and benefits received by the desseizor during his unlawful occupancy, and the term is commonly used to denote the damages recoverable in ejectment. These may be measured by the rental value of the premises, or they may be more. When the rental value, alone, compensates the plaintiff, it governs the award of damages; when that value falls short of such compensation, it does not. Compensation being the basis of the recovery, the wrongdoer must respond for gains prevented as well as for losses sustained, *so far as the same are sufficiently alleged and proved. Capital Garage Co. v. Powell, supra,* pp. 307, 308. The plaintiff could also, if specially alleged, have recovered in ejectment such consequential damages as had resulted from the acts of the defendant, Chester A. Woish, while in wrongful occupation of the premises." (citing authorities) *Id.* at 99 (Emphasis added).

We consider the key words in the two Vermont cases as applied to this case to be the words we have italicized.

Both 3 *Sedgwick* (§ 908) and *Newell* (607) refer to the old Georgia case of *Averett v. Brady,* 20 Ga. 523 (1856), in which a defendant in possession of a ferry

was required to account for the net profits of the ferry. We construe what Judge Menchine said as indicating that the ferry case is the type of situation he had in mind where evidence of profits would be admissible. By whatever name it may be called, what is sought is fair compensation to the landowner for the loss he has sustained. The rule is succinctly summarized in *Newell* where it is said:

> "Hence, on principle, and according to the weight of authority, the amount of recovery for mesne profits is the annual value of the premises wrongfully withheld from the time the plaintiff's title accrued, not exceeding, however, the period fixed by the statute of limitations." *Id.* at 607.

*See also* 3 *Sedgwick* § 908. Judge Menchine's comments relative to the proffered evidence make it plain that profits of one of the defendants in this case could not be equated with damages. They were open to a contention that they were "uncertain, speculative, and remote", being reminiscent of what Chief Judge McSherry saw as objectionable on this subject in *Lanahan v. Heaver*, 79 Md. 413, 422-423, 29 A. 1036 (1894), from which we recently quoted in *Reighard v. Downs*, 261 Md. 26, 273 A. 2d 109 (1971).

The trial judge was correct in his conclusion that on the facts of this case the best test of damages was the rental value of the property.

*Judgment affirmed; appellants to pay the costs.*

Curtis Bay Branch, B. & O. R.R.

Owned by
Van Ruymbeke

Patapsco Avenue

Accretions awarded
to Van Ruymbekes by jury

Accretions
awarded to
Van Ruymbekes
by jury

Disputed area 7.5802 Acres in
15.8055 City

1.1632
Acres

N
W E
E

Disputed area
on appeal
8.2253 Acres Approx. 8 acres of
in County accretions

Boundary line Baltimore City
Baltimore County

Line of Linthicum's Comet
(Part of which is claimed by
Patapsco by deed)

Patapsco River